# United States Court of Appeals
## For the First Circuit

No. 03-1135

GLORIA AREVALO,

Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF A FINAL ORDER OF
THE IMMIGRATION AND NATURALIZATION SERVICE

Before

Selya, <u>Circuit Judge</u>,
R. Arnold,* <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Anthony Drago, Jr.</u>, with whom <u>Anthony Drago, Jr., P.C.</u> was on brief, for petitioner.
<u>Papu Sandhu</u>, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom <u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, and <u>Emily Anne Radford</u>, Associate Director, Civil Division, were on brief, for respondent.

August 29, 2003

_____

*The Hon. Richard S. Arnold, of the Eighth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  This appeal poses two questions, both of first impression in this circuit, arising out of Congress's 1996 revision of the immigration laws.  First, we must determine what standard the new law requires us to apply when considering whether to grant stays of removal pending appeal (we use the terms "removal" and "deportation" interchangeably in this opinion).  After studying the question, we hold that under the new law such stays are guided by essentially the same standard that informs the grant or denial of preliminary injunctions.  Second, we must decide whether the neoteric statutory procedures for reinstating previous removal orders can be applied retroactively to an illegal reentrant who had requested discretionary relief before those procedures took effect.  We hold that they cannot.  Our reasoning follows.

## I.  STATUTORY FRAMEWORK

In laying the foundation for our consideration of this petition, we first limn the applicable statutory framework.  We then undertake to describe the facts at hand.  Only after we have set the stage do we turn to the issues that confront us.

On September 30, 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) in a comprehensive effort to strengthen and tighten the immigration laws.[1]  See Pub. L. 104-208, 110 Stat. 3009-546 (1996); see also

---

[1]Courts frequently refer to the immigration statutes and the amendments thereto by their Immigration and Nationality Act (INA) and IIRIRA sections rather than by their United States Code

INS v. St. Cyr, 533 U.S. 289, 317 (2001) (describing the overall effect of the IIRIRA); Bejjani v. INS, 271 F.3d 670, 683 (6th Cir. 2001) (similar). In doing so, Congress repealed and amended various parts of the Immigration and Nationality Act (INA), including the provision on reinstatement of orders of deportation for those who illegally reenter the United States. See IIRIRA § 305(a)(3) (codified as amended at INA § 241, 8 U.S.C. § 1231 (2002)) (replacing INA § 242(f), 8 U.S.C. § 1252(f)). These changes became effective on April 1, 1997. See IIRIRA § 309(a).

The new reinstatement provision, replicated in the margin,[2] differs from its predecessor in a number of material respects. Compare INA § 241(a)(5), with INA § 242(f) (repealed 1996). First, the current provision expands the category of

---

sections. To mitigate confusion, all citations to INA and IIRIRA sections will therefore include initial cross-references to their corresponding sections in the Code but will appear thereafter only as citations to their respective session laws.

[2]The statute reads:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this Act, and the alien shall be removed under the prior order at any time after the reentry.

INA § 241(a)(5).

-3-

illegal reentrants who may be subject to reinstatement of a previous deportation order. Whereas its immediate ancestor authorized reinstatement only for those who had been deported for certain enumerated reasons (e.g., persons convicted of aggravated felonies), the new provision authorizes reinstatement of prior removal orders for all illegal reentrants previously deported for any reason. See Ojeda-Terrazas v. Ashcroft, 290 F.3d 292, 296 (5th Cir. 2002) (describing operation of reinstatement procedures under the IIRIRA); Alvarez-Portillo v. Ashcroft, 280 F.3d 858, 862-63 (8th Cir. 2002) (same).

Second, persons subject to reinstatement of a previous deportation order no longer are entitled to a hearing before an immigration judge (with its concomitant right to counsel and opportunity to develop an administrative record). Compare 8 C.F.R. § 241.8(a)&(b) (2003), with 8 C.F.R. § 242.23 (removed 1997). Instead, the Immigration and Naturalization Service (INS) may employ a summary administrative procedure in which an immigration official, not a judge, makes all the necessary determinations concerning the decision to recommence deportation.[3] An alien is

---

[3]Congress recently abolished the INS as an independent agency within the Department of Justice and transferred its functions to the newly established Department of Homeland Security. See Homeland Security Act, Pub. L. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)) (2002). The INS functions relevant to this case, including the adjudication of asylum claims, now reside in the Bureau of Citizenship and Immigration Services within the Department of Homeland Security. Because the petitioner was detained before this change took place,

allowed only to "make a written or oral statement contesting the [immigration official's] determination."  8 C.F.R. § 241.8(b).

Third, a person facing reinstatement of an earlier deportation order may neither attack the validity of the earlier order nor endeavor to avoid removal by obtaining discretionary relief (apart from asylum).  INA § 241(a)(5).  By contrast, the pre-IIRIRA regime allowed those in deportation proceedings to request an adjustment of status (although granting the request lay within the discretion of the Attorney General).  See 8 C.F.R. § 242.17(a) (removed 1997).  Even those reentering the United States illegally could seek such an adjustment.  See INA § 245(i) (8 U.S.C. § 1255(i)) (repealed 1996); 8 C.F.R. §§ 245.1, 245.10 (1996).

## II.  THE FACTS

The petitioner in this case first arrived in the United States in 1986 under the pseudonym "Maria Guadalupe Sillas-Mendoza."  She was soon apprehended by the INS and, because she had entered without the documentation necessary for legal admission, an immigration judge ordered her deported to her native Guatemala.  In 1990, the petitioner illegally reentered the United States, this time using the name "Gloria Arevalo."  She has remained here from

_____

we continue to refer to the agency as the INS.  We note, however, that our jurisdiction derives from INA § 242(b)(2) (8 U.S.C. § 1252(b)(2)) (2003), so the proper respondent is the United States Attorney General, see INA § 242(b)(3)(A) (8 U.S.C. § 1252(b)(3)(A)) (2003).

that time forward and given birth to two children (both of whom are American citizens).

In August of 1990, the petitioner's father, a legal permanent resident, filed a visa petition on her behalf. The INS approved that petition and issued an employment authorization card (a so-called "green card") to the petitioner. In March of 1996, the petitioner applied for adjustment of status to become a legal permanent resident and tendered the requisite fee. See INA § 245(i). On her application, she falsely swore that she had never been deported from the United States.

Proceedings on the petitioner's application for adjustment of status lagged for almost six years. Finally, fingerprint analysis revealed that she had previously been deported under a different name. The INS sent the petitioner a letter in January of 2002, notifying her of its discovery and advising her that it would not entertain her application for adjustment of status. The INS did nothing further, however, until January 17, 2003, when it detained the petitioner. Acting under the INA's current reinstatement provision, see supra note 2, the INS then resurrected the previous order of deportation and instructed the petitioner that she had no right either to seek a hearing before an immigration judge or to apply for discretionary relief.

The petitioner repaired to the United States District Court for the District of Massachusetts, challenging the Attorney

General's authority summarily to reinstate the previous order of deportation. The district court, concluding that it lacked subject matter jurisdiction over most of the petitioner's claims, transferred the case to us. See 28 U.S.C. § 1631 (allowing inter-court transfers to cure lack of jurisdiction). Acting under INA § 242(b)(3)(B) (8 U.S.C. § 1252(b)(3)(B)) (2003), we temporarily stayed the petitioner's deportation and set a briefing schedule. We heard oral argument on June 4, 2003, and took the matter under advisement.

## III.  THE STAY

The stay of the order of deportation remains in effect. The INS challenges it, asserting that its issuance was predicated upon an improper legal standard. We do not agree.

Before Congress enacted the IIRIRA, an alien seeking review of a deportation order was entitled to an automatic stay pending the completion of that review. See INA § 106(a)(3) (8 U.S.C. § 1105a(a)(3)) (repealed 1996). The IIRIRA altered that paradigm:  INA § 242(b)(3)(B) requires a review-seeker to ask the reviewing court for a stay of removal. But section 242(b)(3)(B) does not specify the standard that a court should use in deciding whether to grant a stay.

To fill this vacuum, the INS invites us to turn to a neighboring subsection, namely, INA § 242(f)(2) (8 U.S.C. § 1252(f)(2)) (2003). That subsection provides:

-7-

> Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

INA § 242(f)(2). According to the INS, a stay is an injunction, and, thus, the review-seeker cannot obtain a stay unless she can show the illegality of the removal order by clear and convincing evidence. We decline the INS's invitation to treat a temporary stay on a par with a permanent injunction.

Although this is a matter of first impression in this court, the case law in other circuits provides a modicum of guidance. In <u>Andreiu</u> v. <u>Ashcroft</u>, 253 F.3d 477 (9th Cir. 2001) (en banc), the Ninth Circuit rejected the INS's proposal that the clear and convincing evidence standard should apply to a stay of removal <u>pendente</u> <u>lite</u>. The court instead adopted the preliminary injunction standard. <u>Id.</u> at 483. Under this quadral standard, a petitioner must demonstrate (1) that she is likely to succeed on the merits of her underlying objection; (2) that she will suffer irreparable harm absent the stay; (3) that this harm outweighs any potential harm fairly attributable to the granting of the stay; and (4) that the stay would not disserve the public interest.

The Ninth Circuit's holding has been embraced in opinions published by both the Second and Sixth Circuits. <u>See</u> <u>Mohammed</u> v. <u>Reno</u>, 309 F.3d 95, 98-100 (2d Cir. 2002); <u>Bejjani</u>, 271 F.3d at 687-88. The Seventh Circuit reached the same conclusion in an

-8-

unpublished opinion.  See <u>Lal</u> v. <u>Reno</u>, 221 F.3d 1338 (7th Cir. 2000) (unpublished table opinion).  The Eleventh Circuit, however, has adopted the clear and convincing evidence standard in this context.  <u>See</u>, <u>e.g.</u>, <u>Weng</u> v. <u>United States Atty. Gen.</u>, 287 F.3d 1335, 1340 (11th Cir. 2002).  For the reasons that follow, we adhere to the majority view.

We start — as we must — with the language of the statute itself.  The subsection immediately preceding INA § 242(f)(2) establishes the Supreme Court's exclusive jurisdiction "to enjoin or restrain the operation of the provisions of [this subchapter]." INA § 242(f)(1) (8 U.S.C. § 1252(f)(1)) (2003).  In contradistinction, subsection (f)(2) employs only the term "enjoin."  Even though courts frequently use the terms "enjoin" and "restrain" interchangeably, this linguistic shift makes it appear likely that Congress intended the words "enjoin" and "restrain" to have different meanings.  Otherwise, the use of the word "restrain" in subsection (f)(1) would be pointless — a circumstance that would put the subsection at odds with the venerable rule that statutes should be interpreted, whenever possible, to give every word and phrase some operative effect.[4]  <u>See</u> <u>Walters</u> v. <u>Metro. Educ.</u>

---

[4]In point of fact, subsection (b)(3) uses the word "stay" rather than either "enjoin" or "restrain," <u>see</u> INA § 242(b)(3)(B) (stating that service of a petition for judicial review "does not stay the removal of an alien"), making it even less likely that this subsection was intended to incorporate the language of subsection (f)(2).

Enters., 519 U.S. 202, 209 (1997) (explaining this point); United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) (same). The most sensible way to give operative effect to both words in this statutory scheme is to treat the word "enjoin" as referring to permanent injunctions and the word "restrain" as referring to temporary injunctive relief (such as a stay). This distinction between "enjoin" and "restrain" mirrors an identical distinction expressly made in the Hobbs Act, 28 U.S.C. § 2349(a)&(b) — a statute that INA § 242(a)(1) explicitly incorporates. See Maharaj v. Ashcroft, 295 F.3d 963, 965 (9th Cir. 2002).

Moreover, courts long have employed the conventional preliminary injunction test in considering requests for discretionary stays of deportation. See, e.g., Michael v. INS, 48 F.3d 657, 662 n.4 (2d Cir. 1995); Ignacio v. INS, 955 F.2d 295, 299 & n.5 (5th Cir. 1992) (per curiam). We believe that if Congress had wanted to break from the routine of the past and apply a heightened standard to stays pending appeal, it most likely would have included such a standard in INA § 242(b)(3) itself. Cf. Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.), 327 F.3d 537, 548 (7th Cir. 2003) (refusing to interpolate limitations from one statutory section into a different section when the legislature itself did not do so). In the absence of such a specific directive, reading INA § 242(f)(2) in a more

-10-

circumspect manner follows the path demarcated by the Supreme Court in <u>Reno</u> v. <u>American-Arab Anti-Discrimination Committee</u>, 525 U.S. 471, 482-87 (1999), in which the Court indicated that section 242 should be construed narrowly (in part because the execution of removal orders is juridically distinct from the merits of those orders).

Perhaps most important, we recognize that extending subsection (f)(2)'s stringent clear and convincing evidence standard to stays pending appeal under subsection (b)(3)(B) would result in a peculiar situation in which adjudicating a stay request would necessitate full deliberation on the merits of the underlying case and, in the bargain, require the alien to carry a burden of proof <u>higher</u> than she would have to carry on the merits. This Kafkaesque design is counterintuitive. Typically, stays are granted or denied without a full adjudication on the merits, based in part on the likelihood — not the certainty — of eventual success. <u>See</u>, <u>e.g.</u>, <u>Acevedo-Garcia</u> v. <u>Vera-Monroig</u>, 296 F.3d 13, 16 (1st Cir. 2002); <u>see</u> <u>generally</u> 11A Charles Alan Wright et al., Federal Practice & Procedure § 2947, at 122 (2d ed. 2003). The reading of the statute advanced by the petitioner and adopted in <u>Andreiu</u> and its progeny comports with this conventional approach. The INS's reading, on the other hand, creates a severe anomaly.

The anomaly is magnified when one considers the barebones administrative record from which appellate judges must work in

deportation cases. <u>See</u> INA § 242(b)(4)(A) (8 U.S.C. § 1252 (b)(4)(A)) (2003) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based.").[5] It is trite, but true, that courts are bound to interpret statutes whenever possible in ways that avoid absurd results. <u>United States</u> v. <u>Wilson</u>, 503 U.S. 329, 334 (1992); <u>Atlantic Fish Spotters Ass'n</u> v. <u>Evans</u>, 321 F.3d 220, 225 (1st Cir. 2003). That prudential rule seems apposite here.

If more were needed — and we doubt that it is — a survey of the IIRIRA amendments reveals that INA § 242(b)(3)(B) employs language identical to that used in IIRIRA § 309(c)(4)(F), which regulates stays pending appeal in so-called transitional cases (cases pending as of the IIRIRA's effective date). In acting under IIRIRA 309(c)(4)(F), courts unhesitatingly have used the preliminary injunction standard in deciding whether to grant or deny a stay. <u>See</u>, <u>e.g.</u>, <u>Sofinet</u> v. <u>INS</u>, 188 F.3d 703, 706 (7th Cir. 1999); <u>Abbassi</u> v. <u>INS</u>, 143 F.3d 513, 514 (9th Cir. 1998). We think it highly probable that IIRIRA § 309(c)(4)(F) carries the language and effect of INA § 242(b)(3)(B) backward in time.

In reaching these conclusions, we acknowledge that the Eleventh Circuit has interpreted INA § 242(f)(2) in line with the

---

[5]The administrative record may be particularly scanty in cases such as the petitioner's. Under INA § 241(a)(5), aliens are no longer afforded an opportunity for a hearing. <u>See</u> <u>Bejjani</u>, 271 F.3d at 675-76.

INS's view, and that a tougher standard for obtaining stays while awaiting judicial review of removal orders may be philosophically in keeping with the overall goals of the IIRIRA amendments. See, e.g., Weng, 287 F.3d at 1340. But the change from automatic stays (the pre-IIRIRA regime) to stays granted only upon making the four-part preliminary injunction showing is itself a significant tightening of the law and, thus, is consistent with the fundamental policies undergirding the IIRIRA amendments. We reject an interpretive rule that would require courts invariably to construe all immigration statutes in the most draconian manner that their words conceivably could support.

In sum, we hold that the applicable standard for evaluating requests for stays pending review of final orders of removal is the four-part algorithm used for preliminary injunctions. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (describing the four-part standard for preliminary injunctions); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991) (same). As can readily be gleaned from our ensuing discussion of the reinstatement provision, see infra Part IV, the stay previously granted in this case easily meet those requirements.

## IV. THE MERITS

The petitioner claims that because she reentered the United States and applied for adjustment of status before the

-13-

IIRIRA's effective date, that statute cannot be used as a vehicle for reinstating the previous deportation order (and, thus, abrogating her right to seek an adjustment of status). Before considering the merits of the petitioner's claim, we pause to clarify certain threshold matters.

### A.  Jurisdiction and Standard of Review.

There is little doubt that we have appellate jurisdiction over the reinstatement of an order to deport an illegal reentrant. The reinstatement itself operates as the functional equivalent of a final order of removal. While we cannot revisit the validity of the original deportation order, see INS § 241(a)(5), we do have the authority to determine the appropriateness of its resurrection. See Ojeda-Terrazas, 290 F.3d at 294-95 (collecting cases); see also INA § 242(b)(2).

The petitioner's claim is based on the theory that the INS's invocation of the new reinstatement provision was impermissibly retroactive. That raises a question as to what standard of review applies to our retroactivity analysis. The INS asserts that we owe it deference as the agency in charge of administering the INA. See INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999); see generally Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865 (1984). We disagree.

We defer to an agency's interpretation of a statute only when the statute is ambiguous. See Chevron, 467 U.S. at 843. But

-14-

when a statute is silent as to its temporal reach and a court is called upon to construe it, under legal precedents, in order to decide whether it should be interpreted retrospectively or prospectively with regard to a particular antecedent event, there is no occasion for Chevron deference. See St. Cyr, 533 U.S. at 320 n.45 (explaining that for Chevron purposes, there is "no ambiguity . . . for an agency to resolve"); Bejjani, 271 F.3d at 679-80 (rejecting the INS's claim of Chevron deference in interpreting section 241(a)(5)); Velasquez-Gabriel v. Crocetti, 263 F.3d 102, 106 n.2 (4th Cir. 2001) (same). After all, courts, rather than agencies, are best equipped to make the constitutionally tinged judgment calls inherent in retroactivity determinations. See Pak v. Reno, 196 F.3d 666, 675 n.10 (6th Cir. 1999); Sandoval v. Reno, 166 F.3d 225, 239-40 (3d Cir. 1999); Goncalves v. Reno, 144 F.3d 110, 127 (1st Cir. 1998).

We note, moreover, that we do not review here an INS decision to grant or deny the petitioner an adjustment of status. The INS may be quite right that such decisionmaking is committed to the Attorney General's discretion (and, as such, is largely unreviewable). See Jay v. Boyd, 351 U.S. 345, 353 (1956); Carranza v. INS, 277 F.3d 65, 71-72 (1st Cir. 2002). Rather, we review in this proceeding the INS's unilateral determination that Congress intended to make INA § 241(a)(5) effective even as to applications for discretionary relief that were pending at the time of its

-15-

enactment (and, if so, whether that gives the statute an impermissibly retroactive cast). This inquiry raises pure questions of law. See Mattis v. Reno, 212 F.3d 31, 35 (1st Cir. 2000); LaGuerre v. Reno, 164 F.3d 1035, 1041 (7th Cir. 1998). Accordingly, we proceed to the retroactivity issue, employing de novo review.

## B. **Retroactivity**.

The Supreme Court has prescribed the proper rubric by which a court should determine whether a statute enacted after a particular event can nonetheless direct the legal consequences of that event.[6] See Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994); see also St. Cyr, 533 U.S. at 316, 320 (applying the Landgraf rubric in the immigration context). As in all cases of statutory construction, the initial question involves the extent to which the legislature has spoken to the matter. Martin v. Hadix, 527 U.S. 343, 352 (1999); Associated Fisheries, Inc. v. Daley, 127 F.3d 104, 112 (1st Cir. 1997). This is particularly apropos with respect to retroactivity: "a requirement that Congress first make

---

[6]In criminal cases, other rubrics may apply (e.g., the Double Jeopardy Clause or the Ex Post Facto Clause). Despite its grave consequences, however, deportation constitutes a matter of civil rather than criminal procedure. Harisiades v. Shaughnessy, 342 U.S. 580, 594-95 (1952); Seale v. INS, 323 F.3d 150, 159 (1st Cir. 2003). Thus, neither the Double Jeopardy Clause nor the Ex Post Facto Clause are relevant to deportation proceedings. See Breed v. Jones, 421 U.S. 519, 528 (1975) (discussing Double Jeopardy Clause); Galvan v. Press, 347 U.S. 522, 530-31 (1954) (discussing Ex Post Facto Clause).

its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." Landgraf, 511 U.S. at 268.

In answering this question, courts should employ the customary rules of statutory construction, assaying the language of the statute itself and then considering its structure and purpose. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Landgraf, 511 U.S. at 262.

If the statute itself does not sufficiently denote the temporal reach of its provisions, further inquiry follows a well-trod path. When a new statute is silent as to how (if at all) it applies to antecedent conduct, an inquiring court must proceed to examine whether application of the statute in that fashion would create an impermissibly retroactive effect, that is, whether such an application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280. If such ramifications loom, the default rule is that the statute should not be construed to regulate the past conduct. Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 946 (1997); United States v. Puerto Rico, 287 F.3d 212, 217 (1st Cir. 2002). Here, then, our retroactivity analysis must focus on the repercussions of the recently enacted statute vis-à-

vis persons situated similarly to the petitioner in relevant respects. McAndrews v. Fleet Bank, 989 F.2d 13, 16 (1st Cir. 1993).

The mere fact that a new statute has some retroactive effect does not make the answer to this inquiry a foregone conclusion. A new law is not impermissibly retroactive simply because subsequent proceedings under that law's authority implicate past events. Puerto Rico, 287 F.3d at 217. "[A]pplication of new statutes passed after the events in suit is unquestionably proper in many situations." Landgraf, 511 U.S. at 273; accord St. Cyr, 533 U.S. at 315. The statute's temporal reach becomes unacceptable only when its retrospective application would significantly impair existing substantive rights and thereby disappoint legitimate expectations. Gen. Motors Corp. v. Romein, 503 U.S. 181, 191 (1992); McAndrews, 989 F.2d at 15.

Although pristine in theory, distinctions between permissible and impermissible effects are often fuliginous in practice. That potential difficulty argues for close scrutiny of a new law in its diverse applications. Landgraf, 511 U.S. at 270; Pratt v. United States, 129 F.3d 54, 59 n.4 (1st Cir. 1997). Such scrutiny demands "a common sense, functional judgment about whether the new provision attaches new legal consequences" to a past event — a judgment "informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations."

-18-

<u>Martin</u>, 527 U.S. at 357-58 (citations and internal quotation marks omitted).

In examining the text of a statute, we recognize that, as a general rule, the benchmark for finding unambiguous temporal scope is quite high. <u>See</u> <u>id.</u> at 354-55 (intimating that nothing less than phrases such as "shall apply to all proceedings pending on or commenced after the date of enactment" can make a statute unambiguously retroactive); <u>see</u> <u>also</u> <u>St. Cyr</u>, 533 U.S. at 316. A series of courts have ruled that the wording of section 241(a)(5) fails to achieve this benchmark. <u>See</u>, <u>e.g.</u>, <u>Alvarez-Portillo</u>, 280 F.3d at 864; <u>Bejjani</u>, 271 F.3d at 680; <u>Velasquez-Gabriel</u>, 263 F.3d at 106. Although IIRIRA § 309(a) establishes an effective date of April 1, 1997 for Title III-A (the title in which section 241 resides), it too fails to provide the necessary guidance.[7] <u>See</u> <u>St. Cyr</u>, 533 U.S. at 317 ("[A] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.") (citations and internal quotation marks omitted).

Attempting to show congressional intent, the INS points to section 241(a)(5)'s use of the perfective participle "has reentered" rather than the present tense "reenters or attempts to

---

[7]The so-called savings clause, IIRIRA § 309(c)(1), is of little help. That clause states that the amendments promulgated under Title III-A shall not control removal proceedings pending on April 1, 1997. Here, however, the INS did not reinstate the previous deportation order until 2003.

reenter" seen, for example, in INA § 212(a)(9)(C)(ii) (8 U.S.C. § 1182(a)(9)(C)(ii)) (2003) (defining classes of aliens who are inadmissible). This gambit fails for two reasons. First, section 212(a)(9)(C)(ii) regulates an alien's admissibility (i.e., her ability to enter the country lawfully), whereas section 241(a)(5) relates to an alien's removability (i.e., her liability for deportation). See Rosales-Garcia v. Holland, 322 F.3d 386, 391 n.1 (6th Cir. 2003); Almon v. Reno, 192 F.3d 28, 30 (1st Cir. 1999). For that reason, it was logical for Congress to vary the tenses in the statutes accordingly. One cannot read anything further into these contrasting linguistic choices. Accord Ojeda-Terrazas, 290 F.3d at 300 (finding that this difference in language "is not so clear that it could sustain only one interpretation") (citation and internal quotation marks omitted). Second, this distinction between sections 241 and 212 addresses, if anything, the relative effects of time of reentry; it does not speak at all to the potential effect of when an application for discretionary relief was filed.

For her part, the petitioner would have us read section 241(a)(5) prospectively based upon its legislative history. Section 242(f), the reinstatement provision's pre-IIRIRA embodiment, contained an express retroactivity proviso permitting the Attorney General to reinstate deportation orders for those illegally reentering the United States "after having previously

-20-

departed or been deported . . . whether before or after June 27, 1952."  In drafting the new reinstatement provision, Congress declined to carry forward this concept.  In that process, it rejected drafts that included explicit retroactivity language.  See H.R. Rep. No. 104-469(I), at 416-17 (1996), 1996 WL 168955; S. Rep. No. 104-249, at 118 (1996), 1996 WL 180026.  On this basis, the petitioner asserts that Congress must have meant the new reinstatement provision to apply only to reentries occurring after its effective date.

We are not as sanguine about this theory as the petitioner.  Although Congress is presumed to be aware of the law's general aversion to retroactivity, see Castro-Cortez v. INS, 239 F.3d 1037, 1052 (9th Cir. 2001), it must also be presumed to know that some Landgraf inquiries come out the other way.  Hence, Congress's failure to include explicit reach-back language in the current version of the reinstatement provision, without more, lacks decretory significance.  Cf. Rivers v. Roadway Exp., Inc., 511 U.S. 298, 307-09 (1994) (declining to attribute dispositive effect to the pretermission of retroactivity language in the final draft of the "make and enforce contracts" provision of the Civil Rights Act of 1991); Landgraf, 511 U.S. at 262-63 (noting the same phenomenon with respect to the damages provision of the Civil Rights Act of 1991).  At most, legislative histories of this type tell us that while Congress may have thought retroactivity to be an important

-21-

topic, it could not muster a clear consensus on the subject. See Rivers, 511 U.S. at 309.

The petitioner also asseverates that we can draw a favorable conclusion from a comparison of INA § 241(a)(5) with other sections of the IIRIRA. She points out that some sections do provide expressly for retroactive application to particular events transpiring before April 1, 1997. See, e.g., IIRIRA § 321(b) (defining aggravated felony); id. § 342(b) (discussing incitement of terrorism as a ground for exclusion); id. § 347(c) (discussing unlawful voting as a ground for exclusion). By negative implication, she asks that we assume that Congress intended section 241(a)(5) to apply only in a prospective manner. See INS v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and internal quotation marks omitted). The problem is that many other sections of the IIRIRA unequivocally state that they will apply only prospectively. See, e.g., IIRIRA § 344(c) (dealing with false claims of citizenship as a ground for exclusion); id. § 352(b) (dealing with renouncing citizenship for tax purposes as a ground for exclusion). Thus, the negative implication argument could just as easily run in the other direction. Courts should be reluctant to impute any meaning to

-22-

disparities between statutory sections that were not drafted with each other in mind. Martin, 527 U.S. at 356-57; Lindh, 521 U.S. at 330. In this instance, then, we unhesitatingly endorse the wise judgment of the Fourth Circuit that "the sometimes retrospective, sometimes prospective provisions that surround [the statute] unveil[] the Janus-like faces of Congress, but leave[] its mind concealed." Tasios v. Reno, 204 F.3d 544, 549 (4th Cir. 2000).

The parties make other arguments, but none is convincing. What comes through loud and clear is that Congress failed to specify the temporal reach of the INA's reinstatement provision. Nor did Congress seed the statute with telltale clues; after careful perscrutation of section 241(a)(5)'s text, history, and structure, we conclude that the statute leaves uncertain whether it should be read to occupy the field even when an application for adjustment of status was already on record at the time the statute took effect. Although Congress devised the IIRIRA as a detailed and comprehensive plan to strengthen the immigration laws, see Am.-Arab Anti-Discrim. Comm., 525 U.S. at 486; Bartoszewska-Zajac v. INS, 237 F.3d 710, 712 (6th Cir. 2001), the comprehensiveness of the statutory scheme says very little about Congress's desires anent the retroactivity vel non of the statute's individual provisions.

To sum up, section 241(a)(5) is hopelessly unclear as to whether it applies to those who illegally reentered the United

States before April 1, 1997. A fortiori, it is all the more tenebrous as to whether it affects those who not only reentered but also applied for adjustment of status before that crucial date. In view of this rampant uncertainty, we must proceed to the second half of the Landgraf model and assess whether the operation of section 241(a)(5) in the instant case would impose new burdens or attach new legal consequences to the petitioner's illegal reentry and-or her pending application for adjustment of status. See Landgraf, 511 U.S. at 269-70. This assessment depends on whether execution of the reinstatement order "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability" to the petitioner's actions in a way that offends the fundamental principles of fair notice and reasonable expectation. Id. (citation and internal quotation marks omitted).

Perhaps the easiest place to start is to note that this case does not entail a challenge to the Attorney General's raw power to disallow the petitioner access to a new deportation hearing; although aliens subject to reinstatement of a previous deportation order had a right to such a hearing before the passage of the IIRIRA, see 8 C.F.R. § 242.23, that right was procedural, and, therefore, can be taken away retroactively. See Ojeda-Terrazas, 290 F.3d at 301-02 (explaining that illegal reentrants cannot entertain any reasonable expectation of having a hearing

before an immigration judge); Alvarez-Portillo, 280 F.3d at 865 (similar); see also Landgraf, 511 U.S. at 275 (remarking "the diminished reliance interests in matters of procedure"); United States v. Thurston, ___ F.3d ___, ___ (1st Cir. 2003) [No. 02-1966, slip op. at 46] (stating that "procedural changes that do not affect substantial rights are not usually considered [impermissibly] retroactive").

What the petitioner can and does contest, however, is the sudden negation of her application for discretionary relief. The availability of relief (or, at least, the opportunity to seek it) is properly classified as a substantive right. See Carranza, 277 F.3d at 71-72 (holding that a current statutory grant of opportunity for discretionary relief from deportation is a substantive right); Goncalves, 144 F.3d at 128 (finding loss of opportunity for discretionary relief from deportation under INA § 212(c) (8 U.S.C. § 1182(c)) (repealed 1996) affected substantive rights); cf. Hughes Aircraft, 520 U.S. at 951 (stating that changes in whether a claim may be brought at all affect substantive rights). We see no reason why the bar on applications for relief under section 241(a)(5) should be deemed an exception to this general rule. Accord Alvarez-Portillo, 280 F.3d at 867; Castro-Cortez, 239 F.3d at 1052 n.17.

The INS objects that, unlike the petitioner in St. Cyr, 533 U.S. at 321-23, the petitioner here can show neither a

-25-

cognizable reliance interest in this right nor a settled expectation based on it. Warming to the task, the INS insists that the petitioner had no protectible interest in applying for relief because an adjustment of status was never a vested right. We think that the INS circumscribes the encincture of relevant interests too grudgingly.

First, the array of pertinent interests listed in Landgraf, Hughes Aircraft, and other influential precedents is not exhaustive but merely illustration by synecdoche. Such listings "simply describe[] several 'sufficient,' as opposed to 'necessary,' conditions for finding retroactivity." St. Cyr, 533 U.S. at 320 n.46. Second, the presumption against statutory retroactivity is not restricted to cases involving vested rights. Landgraf, 511 U.S. at 275 n.29; Goncalves, 144 F.3d at 130. Third, and most important, the petitioner in this case applied for adjustment of status before April 1, 1997 — a fact that distinguishes her in a material way from the mine run of persons who appeal from the reinstatement of previous removal orders. See Velasquez-Gabriel, 263 F.3d at 109-10 (noting that no application for status adjustment had been made before IIRIRA's effective date despite more than adequate time to do so); see also Jurado-Gutierrez v. Greene, 190 F.3d 1135, 1147 n.11 (10th Cir. 1999) (noting that no application for waiver of deportation had been filed before effective date of AEDPA); Wright v. Ouellette, 171 F.3d 8, 11 (1st

Cir. 1999) (noting that motion to reopen was filed after AEDPA's effective date). In the latter genus of cases, it is not possible to complain that section 241(a)(5) appends new legal consequences to an event (the filing of an application for discretionary relief) occurring before its effective date. See Velasquez-Gabriel, 263 F.3d at 110. This is a salient distinction because applications for discretionary relief, once made, often become a source of expectation and even reliance. See, e.g., Mattis, 212 F.3d at 37; Bowen v. Hood, 202 F.3d 1211, 1220-22 (9th Cir. 2000) (per curiam); Wallace v. Reno, 194 F.3d 279, 287 (1st Cir. 1999).

While aliens like the petitioner here, unlike the petitioner in St. Cyr, cannot reasonably rely on the availability of discretionary relief when pondering whether to reenter this country illegally, we nonetheless must look at the impact of the new law on the specific individual. See Hughes Aircraft, 520 U.S. at 947-48; Mattis, 212 F.3d at 37. The petitioner already had filed for relief when Congress amended the statute. Discarding her application now would deprive her both of a right that she once had and of the reasonable expectation that she would have the opportunity to convince the Attorney General to grant her relief. As the Supreme Court recently stated, "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." St. Cyr, 533 U.S. at 325.

Contrary to the INS's position, we do not think it is significant that adjustment of status is a discretionary form of relief. A right to seek relief is analytically separate and distinct from a right to the relief itself. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954); Mayers v. INS, 175 F.3d 1289, 1301 n.15 (11th Cir. 1999). Consequently, an alien is not precluded from having a vested right in a form of relief merely because the relief itself is ultimately at the discretion of the Executive Branch. Goncalves, 144 F.3d at 130.

As a final matter the INS pounces on the petitioner's use of an alias and posits that she cannot be heard to complain of her loss of the right to apply for discretionary relief because of her "unclean hands." This argument is wide of the mark. "The doctrine of unclean hands only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties [and] 'in some measure affect[s] the equitable relations between the parties in respect of something brought before the court for adjudication.'" Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) (quoting Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933)). Although the petitioner's dissembling may very well come back to haunt her when the merits of her application for an adjustment of status are considered, we fail to see how this prevarication relates to the issue of whether section 241(a)(5) applies retroactively to her.

For the reasons stated, we conclude that the text of section 241(a)(5) is uncertain as to the statute's temporal scope, and that the statute, applied as the INS urges, would have an unfairly retroactive effect on the petitioner's rights and expectations. Under these circumstances, the presumption against retroactivity endures. See Landgraf, 511 U.S. at 265. We therefore vacate the INS's unilateral decision to reinstate the petitioner's previous deportation order.[8]

## V. HABEAS RELIEF

One final issue remains. The petitioner originally asked the district court, among other things, for a writ of habeas corpus ordering her immediate release from detention. See 28 U.S.C. § 2241(a). This request was properly filed with the district court. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 687-88 (2001); Vasquez v. Reno, 233 F.3d 688, 690 (1st Cir. 2000). The district court nevertheless refrained from ruling upon the petitioner's habeas claim, recognizing that the propriety of detention depended in large part on questions of law over which this court — and only this court — had jurisdiction. See INA § 242(b)(2) (8 U.S.C. § 1252(b)(2)) (2003) (limiting to courts of appeals all jurisdiction over final orders of removal); see also Castro-Cortez, 239 F.3d at

_____

[8]In view of this holding, we need not probe more deeply the petitioner's alternative argument that the Due Process Clause also bars the unilateral reinstatement of the previous deportation order.

-29-

1047 (explaining that federal courts should exercise habeas jurisdiction only when all other judicial and administrative avenues have been exhausted). We have now answered those questions. Accordingly, we retransfer this case to the district court for further proceedings on the remnant habeas claim. See 28 U.S.C. § 2241(b); see also Carranza, 277 F.3d at 67.

## VI. CONCLUSION

We need go no further. We uphold the stay of deportation previously granted and rule that the recent changes to the reinstatement provision of the INA would, if given retroactive effect, unfairly attach new legal consequences to the petitioner's preexisting application for an adjustment of status. We therefore hold that the new reinstatement provision cannot be applied in this instance. Accordingly, we vacate the reinstatement of the original removal order and transfer what remains of the petition to the district court for further proceedings consistent with this opinion. The INS, of course, is free (again, consistent with this opinion) to resume the processing of the petitioner's application for adjustment of status and to go forward with a new round of removal proceedings.


**It is so ordered.**