# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 03-2755 & 04-1108

RAFAL J. LABOJEWSKI,

*Petitioner*,

v.

ALBERTO R. GONZALES,[1]
Attorney General of the United States,

*Respondent.*

_____

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A27-007-734

_____

FAUSTINO CHAVEZ-SALDANA,

*Petitioner*,

v.

ALBERTO R. GONZALES,
Attorney General of the United States,

*Respondent.*

_____

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A21-080-005

_____

ARGUED NOVEMBER 10, 2004—DECIDED MAY 4, 2005

_____

[1] Pursuant to FED. R. APP. P. 43(c), we have substituted Alberto
R. Gonzales for John Ashcroft as the named respondent.

Before COFFEY, RIPPLE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* We have consolidated these immigration cases for decision on the question of whether the deportation reinstatement provision of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), 8 U.S.C. § 1231(a)(5), is impermissibly retroactive when applied to an alien who reentered the United States before but applied for adjustment of status after the Act's effective date. This question was reserved in this court's recent opinion in *Faiz-Mohammad v. Ashcroft*, 395 F.3d 799 (7th Cir. 2005), which held that § 1231(a)(5) is impermissibly retroactive when applied to an alien who reentered the United States *and* applied for adjustment of status prior to IIRIRA's effective date. We now hold that § 1231(a)(5) is not impermissibly retroactive when applied to an alien who reentered the United States before IIRIRA's effective date but did not apply for adjustment of status until after the Act became effective.

## I.  Background

Rafal Labojewski, a citizen of Poland, entered the United States on a visitor's visa in 1987. He overstayed the visa and on November 5, 1990, was ordered deported. He illegally reentered the United States in 1992 or 1993 using a false passport and visa. In November 1994 Labojewski's mother, a lawful permanent resident, filed an alien relative visa petition on his behalf, which was approved on May 2, 1995. In September 2001 Labojewski applied for adjustment of status based upon his mother's lawful permanent resident status. In this application Labojewski falsely answered "[n]o" to the question of whether he had ever been deported from the United States.

Faustino Chavez-Saldana, a citizen of Mexico, entered the United States without inspection in May 1975. He was arrested and ordered removed in March 1976. He reentered

illegally that same year using the alias "Joaquin Martinez-Flores." He was arrested and voluntarily departed in October 1976. He again reentered illegally about a year later, this time using the alias "Alfredo Vasquez Casales." He was arrested and deported in January 1978. Three months later, in April 1978, he reentered illegally, again using the name "Alfredo Vasquez Casales." He was apprehended and deported in May 1978, after submitting a sworn statement that his true name was Alfredo Vasquez Casales and that he had never used any other name.

Chavez-Saldana again reentered without inspection in June 1978, and this time was charged and convicted of violating 8 U.S.C. § 1326 for illegal reentry after previous deportation. He was sentenced in the United States District Court for the Southern District of New York to a two-year term of imprisonment, suspended in favor of three years' probation, with the condition that he leave the United States and not return without permission. The sentence was entered on December 19, 1978; he was deported from New Orleans on December 28, 1978.

Chavez-Saldana again reentered the United States without inspection in the early or mid-1990s—the government says it was April 1992, Chavez-Saldana says it was March 1995. Chavez-Saldana claims that on July 20, 1996, his son, a United States citizen, filed an alien relative visa petition on his behalf, and further contends that the petition was approved on February 7, 1997. Neither the petition nor the approval is in the record, however, and thus it is unclear whether the visa petition disclosed Chavez-Saldana's history of illegal reentry and deportation or his use of aliases. On September 30, 1997, Chavez-Saldana applied for adjustment of status using the name "Faustino Chavez." In his application he falsely answered "[n]o" to the question of whether he had ever been deported from the United States and also falsely answered "[n]o" to the question of whether

he had ever sought entry into the United States by fraud or willful misrepresentation of material fact.

On September 30, 1996—after Labojewski and Chavez-Saldana reentered the United States illegally but before they applied for adjustment of status—Congress adopted the IIRIRA. Pub. L. No. 104-208, 110 Stat. 3009-546 (1996). As is pertinent to these cases, IIRIRA created § 241(a)(5) of the Immigration and Nationality Act ("INA"), appearing at 8 U.S.C. § 1231(a)(5), which provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

INA § 241(a)(5), 8 U.S.C. § 1231(a)(5).

This new provision, part of an attempt to streamline then-existing removal procedures, requires the summary reinstatement of a prior removal order of an illegal alien who reenters the United States illegally after previously having been deported for any reason. *See Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 296 (5th Cir. 2002). The old reinstatement provision—INA § 242(f), appearing at 8 U.S.C. § 1252(f)—authorized summary reinstatement only for those illegal aliens previously deported for specified reasons, such as commission of an aggravated felony. *Id.*; *Arevalo v. Ashcroft*, 344 F.3d 1, 5 (1st Cir. 2003). In contrast, § 1231(a)(5) operates against all aliens who reenter illegally after prior removal, prohibiting any review of the merits of the prior removal order as well as any opportunity to seek adjustment of status, a form of discretionary relief previously

available even to those who illegally reentered the United States. *Faiz-Mohammad*, 395 F.3d at 810; *Arevalo*, 344 F.3d at 5.

Also, pursuant to regulations implementing § 1231(a)(5), an illegal alien subject to reinstatement under the statute is not entitled to a hearing before an immigration judge on the issue of reinstatement of the prior removal order.[2] Instead, an immigration officer determines the alien's identity, whether he or she was subject to a prior order of removal, and whether he or she unlawfully reentered the United States. 8 C.F.R. § 241.8(a), (b); *Ojeda-Terrazas*, 290 F.3d at 296. The alien is provided an opportunity to make a statement; if the alien expresses fear of persecution if removed, the matter is referred to an asylum officer. 8 C.F.R. § 241.8(b), (e). Otherwise, if the foregoing predicate determinations are made, the prior order of removal is reinstated.

IIRIRA became effective April 1, 1997. Chavez-Saldana applied for adjustment of status in September 1997; Labojewski applied for adjustment of status in September 2001. In the course of adjudicating Labojewski's and Chavez-Saldana's petitions to adjust status, the Department of Homeland Security determined that both aliens had reentered the United States illegally after having been removed. Accordingly, the Immigration and Customs Enforcement Bureau invoked § 1231(a)(5) and summarily ordered their prior removal orders reinstated. Labojewski and Chavez-Saldana petitioned for review in this court, raising the sole issue of the retroactive effect of § 1231(a)(5).

---

[2] We are aware that the Ninth Circuit has found that the regulations eliminating the alien's right to a hearing before an immigration judge were *ultra vires* and violative of the INA. *See Morales-Izquierdo v. Ashcroft*, 388 F.3d 1299, 1304 (9th Cir. 2004). That issue is not presently before us, however, and we express no opinion on it.

## II. Analysis

In *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994), the Supreme Court established a two-part inquiry to determine the permissibility of retroactive application of a statute. "First, the court must discern whether Congress has spoken to whether the statute should have retroactive effect." *Faiz-Mohammad*, 395 F.3d at 801-02 (citing *Landgraf*, 511 U.S. at 257). If Congress has clearly specified a statute's retroactive reach, then "there is no need to resort to judicial default rules." *Landgraf*, 511 U.S. at 280. An expressly retroactive statute is given its intended retroactive effect unless there is a constitutional impediment to doing so. *Id.* at 267-68.

However, if Congress has not clearly spoken—if the statute is silent or ambiguous about its retroactive reach—then "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280.

The Supreme Court acknowledged in *Landgraf* the inherent tension in retroactivity analysis, in that two well-established legal principles are in conflict. "The first is the rule that 'a court is to apply the law in effect at the time it renders its decision.'" *Id.* at 264 (quoting *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1976)). The second is "the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Id.* at 265. The Court in *Landgraf* reconciled the conflict by deferring to Congress when it clearly expresses its intent that a statute is retroactive and applying a presumption against retroactivity when congressional intent is ambiguous.

Accordingly, when it is unclear whether a statute is meant to be retroactive, "prospectivity remains the appropriate default rule." *Id.* at 272. The requirement of clear congressional intent "assures that Congress itself has affirmatively considered the potential unfairness of retroactive application" and "allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes." *Id.* at 272-73. Where Congress has not made a clear policy judgment about retroactivity, applying the presumption against retroactive legislation "accords with widely held intuitions about how statutes ordinarily operate" and "generally coincide[s] with legislative and public expectations." *Id.* at 272.

The second step in the *Landgraf* test thus seeks to determine whether a statute operates retroactively in the case before the court for purposes of triggering the presumption against retroactive application. The Court cautioned, however, that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based on prior law." *Id.* at 269 (citation omitted). Indeed, the Court indicated that "application of new statutes passed after the events in suit is unquestionably proper in many situations." *Id.* at 273.

For example, "[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* Similarly, "statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when suit was filed," are not considered impermissibly retroactive. *Id.* This is because "jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties'." *Id.* at 274 (quoting *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 100 (1992) (Thomas, J., concurring)). Also, statutes altering procedural rules may be applied to

conduct occurring and cases arising before their enactment "without raising concerns about retroactivity." *Id.* at 275.

Ultimately, "[t]he conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 270. The second half of the *Landgraf* test thus focuses on "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* The analysis requires a "commonsense, functional judgment," *Martin v. Hadix*, 527 U.S. 343, 357 (1999), and calls for an assessment of "familiar considerations of fair notice, reasonable reliance, and settled expectations" to determine whether a statute operates retroactively in the case before the court. *Landgraf*, 511 U.S. at 270.

When these cases were argued, this circuit had not yet addressed whether Congress intended § 1231(a)(5) to apply retroactively. We have since done so. In *Faiz-Mohammad*, we followed the approach of a majority of the circuits and held that congressional intent is unclear as to the retroactive reach of § 1231(a)(5). *Faiz-Mohammad*, 395 F.3d at 804. Accordingly, we move directly to the second step in the *Landgraf* analysis, which asks whether application of § 1231(a)(5) would have an impermissibly retroactive effect if applied to Labojewski and Chavez-Saldana—that is, whether application of the deportation reinstatement provision to either petitioner would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280; *Faiz-Mohammad*, 395 F.3d at 802.

Applying this test in *Faiz-Mohammad*, we held that § 1231(a)(5) would have an impermissibly retroactive effect if applied to an alien who reentered the United States and

applied for adjustment of status prior to IIRIRA's effective date. *Faiz-Mohammad*, 395 F.3d at 809-10. Our decision in *Faiz-Mohammad* took note of *INS v. St. Cyr*, 533 U.S. 289 (2001), in which the Supreme Court applied the second step of the *Landgraf* test to a different provision in IIRIRA and found it impermissibly retroactive.

At issue in *St. Cyr* was the section of IIRIRA that eliminated the Attorney General's discretion under INA § 212(c) to grant a waiver of deportation to persons who had been convicted of certain crimes; the earlier provision barred discretionary relief to persons who had been convicted of certain crimes *and* served a term of at least five years. *St. Cyr*, 533 U.S. at 297. The petitioner in *St. Cyr* had pleaded guilty to a state charge of selling a controlled substance, which made him deportable. This was pre-IIRIRA, and under then-existing law, St. Cyr would have been eligible for a discretionary waiver of deportation. Post-IIRIRA, however, he was ineligible for discretionary relief. *Id.* at 293. Removal proceedings were initiated after IIRIRA's effective date.

Analyzing the case under the second step in the *Landgraf* test, the Supreme Court held in *St. Cyr* that the new statute was impermissibly retroactive under the circumstances of the case, where the defendant alien had pleaded guilty with the expectation that he would be eligible for discretionary waiver. Plea agreements, the Court observed, "involve a *quid pro quo* between a criminal defendant and the government" whereby the defendant waives his constitutional rights in order to obtain "some perceived benefit" from the government. *Id.* at 322. The Court noted that "as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions," and that prior to IIRIRA, "preserving the possibility of [discretionary] relief would have been one of the principal benefits sought by defendants in deciding whether to accept a plea offer or instead to proceed

to trial." *Id.* The Court also noted that discretionary relief was frequently granted. Therefore, when discretionary relief was no longer available after IIRIRA's enactment, the plea deal previously struck by the alien suddenly became worth less. Thus, in *St. Cyr*, the "relevant past event" for purposes of *Landgraf* retroactivity analysis was the alien defendant's agreement to plead guilty with the settled and reasonable expectation of continued eligibility for discretionary waiver of deportation. The Court held that "IIRIRA's elimination of any possibility of § 212(c) relief for people who entered into plea agreements with the expectation that they would be eligible for such relief clearly 'attaches a new disability, in respect to transactions or considerations already past.'" *Id.* at 321 (citing *Landgraf*, 511 U.S. at 269).

We noted in *Faiz-Mohammed* that cases in other circuits addressing the retroactive effect of § 1231(a)(5)'s reinstatement provision have "looked to *St. Cyr* for guidance." *Faiz-Mohammed*, 395 F.3d at 805. Canvassing the circuits, we discerned a generally consistent approach: "When retroactive application has affected only the way in which a petitioner's deportation is adjudicated, because, for instance, the petitioner failed to apply for discretionary relief prior to IIRIRA's effective date, no 'settled expectations' were disturbed." *Id.* at 809. Thus, the First, Fourth, and Fifth Circuits have held that § 1231(a)(5) does not have an impermissibly retroactive effect when applied to aliens who reentered this country before but did not apply for adjustment of status until after IIRIRA's effective date, or did not apply for discretionary relief at all. *Lattab v. Ashcroft*, 384 F.3d 8, 13-16 (1st Cir. 2004); *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, 109-110 (4th Cir. 2001) ("Velasquez-Gabriel's failure to apply to adjust his resident status before the new law took effect fatally undermines his contention that [its] application to him 'attaches new legal consequences to events *completed* before its enactment.'" (quoting *St. Cyr*, 533 U.S. at 321)); *Ojeda-Terrazas*, 290 F.3d at 301-02.

However, where an alien reentered the United States *and* applied for adjustment of status before IIRIRA's effective date, the First and Eleventh Circuits have held that § 1231(a)(5) is impermissibly retroactive. *Arevalo*, 344 F.3d at 15 ("The petitioner already had filed for relief when Congress amended the statute. Discarding her application now would deprive her both of a right she once had and of the reasonable expectation that she would have the opportunity to convince the Attorney General to grant her relief."); *Cisneros v. U.S. Attorney General*, 381 F.3d 1277, 1284 (11th Cir. 2004) ("The retroactive application of section 1231(a)(5) would attach this new disability to a completed transaction, because [Cisneros] applied for discretionary relief in the form of an adjustment of status before the effective date of the IIRIRA."). We reached the same conclusion in *Faiz-Mohammad*. Because "Mr. Faiz-Mohammad both reentered the United States and applied for adjustment of status prior to IIRIRA's effective date . . . , [he] had the right to have his adjustment of status adjudicated." *Faiz-Mohammad*, 395 F.3d at 809-10. Because § 1231(a)(5) eliminated discretionary relief eligibility for aliens who illegally reentered after a previous order of removal, application of § 1231(a)(5) would have impaired a right that Faiz-Mohammad possessed at the time he filed his application and would have attached a "new disability" to his pending application that did not exist prior to IIRIRA's passage. Accordingly, we held that § 1231(a)(5) was impermissibly retroactive and could not be applied in Faiz-Mohammad's case. *Id.* at 810.

Only the Eighth Circuit has held that § 1231(a)(5) is impermissibly retroactive when applied to an alien who illegally reentered the United States before but applied for adjustment of status after IIRIRA's effective date. *Alvarez-Portillo v. Ashcroft*, 280 F.3d 858, 866-67 (8th Cir. 2002). The court reasoned that under "long-standing INS practice" the petitioner "had a reasonable expectation he could either file for a discretionary adjustment of status, or wait and seek

the adjustment as a defense to a later deportation proceeding." *Id.* at 867. Applying § 1231(a)(5), the court said, would deprive him of that defense to deportation. In a footnote in *Faiz-Mohammad*, we noted the Eighth Circuit's departure from the approach taken by the other circuits that have addressed this question. *Faiz-Mohammad*, 395 F.3d at 809, n.10. However, "[b]ecause Mr. Faiz-Mohammad both reentered the United States and applied for adjustment of status prior to IIRIRA's effective date," we declined to consider "whether some lesser action on the part of the petitioner would alter our retroactivity analysis." *Id.*

This case presents the question expressly reserved in that footnote in *Faiz-Mohammad*. We now adopt the majority approach and hold that § 1231(a)(5) is not impermissibly retroactive when applied to an alien who illegally reentered the United States before but applied for adjustment of status after IIRIRA's effective date. In this situation, there is no "reasonable reliance" in the *St. Cyr/Landgraf* sense because the petitioners did not act to their detriment based on the potential for discretionary relief and did not sacrifice any right in reliance on a settled expectation that they would be eligible for adjustment of status. And because Labojewski and Chavez-Saldana did not petition for adjustment of status until *after* the effective date of IIRIRA, application of § 1231(a)(5) to their post-IIRIRA petitions does not impair rights they possessed when they applied or impose a new disability on an already-completed transaction in the *Faiz-Mohammad/Landgraf* sense.

We disagree with the Eighth Circuit that illegal reentry by itself is enough to trigger the presumption against retroactivity. We decline to recognize as "reasonable" any claimed reliance on the perpetual availability of discretionary adjustment of status from the moment an alien contemplates illegal reentry. *See Arevalo*, 344 F.3d at 15 (petitioner could not "reasonably rely on the availability of discretionary relief when pondering whether to reenter this country illegally").

Labojewski and Chavez-Saldana also argue that the alien relative visa petitions filed on their behalf should be deemed to create the sort of vested rights and settled expectations that the presumption against retroactive legislation is intended to protect.[3] We disagree. Although the filing of a visa application is a prerequisite to the filing of an application for adjustment of status, it is not the equivalent of an adjustment of status application and is not the sort of "completed transaction" that gives rise to vested rights or settled expectations for purposes of the presumption against retroactivity. It is, in fact, some steps removed from the filing of an application for adjustment of status, which was the point at which we concluded in *Faiz-Mohammad* that adjudicatory rights and expectations arose for purposes of retroactivity analysis.[4] *Faiz-Mohammad*, 398 F.3d at 809-10.

Under pre-IIRIRA law, an alien who illegally reentered would be eligible to adjust status only if he demonstrated that (1) he had filed an application to adjust status, (2) he was eligible to receive an immigrant visa, and (3) an immigrant visa was immediately available to him at the time the adjustment application was filed. 8 U.S.C. § 1255(a), (i) (1994). An approved visa petition is not a visa, but, rather, is "merely a preliminary step in the visa application process. It does not guarantee that a visa will be issued, nor does it grant the alien any right to remain in the United States." *Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*, 736 F.2d

---

[3] As we have noted, the record in Chavez-Saldana's case does not contain a copy of an alien relative visa petition.

[4] To the extent the petitioners complain that IIRIRA or its companion regulations eliminated their right to a hearing before an immigration judge, their claims fail because procedural changes of this nature are not generally considered to be impermissibly retroactive. *See Landgraf*, 511 U.S. at 275; *Arevalo*, 344 F.3d at 13-14 (citing cases).

1305, 1308 (9th Cir. 1984) (citing *Joseph v. Landon*, 679 F.2d 113, 115 (7th Cir. 1982)). "An initial approval of a visa 'petition does not alone give the beneficiary of the petition an immediate right to an immigrant visa.'" *Joseph*, 679 F.2d at 115 (quoting *DiFigueroa v. INS*, 501 F.2d 191, 193 (7th Cir. 1974)). An approved visa petition thus cannot be considered a "completed act" to which vested rights attach for purposes of the presumption against retroactivity.

Accordingly, we conclude that § 1231(a)(5) does not operate in an impermissibly retroactive fashion when applied against an alien who illegally reentered the United States before but did not apply for adjustment of status until after IIRIRA's effective date.[5] Both petitioners had fair notice on September 30, 1996, when IIRIRA was enacted, that they would no longer be eligible for discretionary adjustment of status as of April 1, 1997, and that they would be subject to summary reinstatement of their prior orders of removal based upon their illegal reentry. Because they did not file for adjustment of status until well after IIRIRA's effective date, they cannot claim that § 1231(a)(5) impairs any vested rights, increases their liability, or attaches new legal consequences to acts already completed before the new law was enacted. The petitions for review are therefore DENIED.

---

[5] This conclusion makes it unnecessary for us to consider the Attorney General's alternate arguments that these petitioners would be inadmissible because of immigration fraud, 8 U.S.C. § 1182(a)(6)(C)(i), or pursuant to the previous five- or current ten-year bar to admissibility, 8 U.S.C. § 1182(a)(6)(B) (1994), 8 U.S.C. § 1182(a)(9)(C)(II).

A true Copy:

Teste:

_____
***Clerk of the United States Court of***
***Appeals for the Seventh Circuit***