United States Court of Appeals
Fifth Circuit

**F I L E D**

May 24, 2005

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 04-61180

_____

SENAIT KIDANE TESFAMICHAEL; DAWIT TESSEMA-DAMTE,

Petitioners,

VERSUS

ALBERTO R. GONZALES,
UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of
the Board of Immigration Appeals

_____

Before DAVIS, SMITH, and DENNIS,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Petitioners Senait Kedane Tesfamichael and Dawit Tessema-Damte, seeking review of their requests for asylum, move this court for a stay of removal pending our consideration, on the merits, of their petition for review of the decision of the Board of Immigration Appeals ("BIA"). We grant the motion for stay.

I.

The petitioners are a married couple seeking asylum in the United States. He, Dawit, is Ethiopian and she, Senait, was born in Ethiopia but is ethnically Eritrean. In the late 1990's, the uneasy situation between Ethiopia and its former province, Eritrea, escalated to war that involved mass deportations by both governments.

When the deportations began in 1998, fearing separation, the petitioners attempted to

leave Ethiopia together. Senait, the ethnically Eritrean wife, was not allowed to leave. She lacked the required government-issued documents, which she claims were unavailable to her as an ethnic Eritrean.

When they were caught attempting to flee to Kenya, Dawit was charged with smuggling Eritreans illegally and was released pending trial. Senait was released only after a guard was bribed. Fearing persecution at trial because he was married to an ethnic Eritrean, and after experiencing some police harassment, Dawit fled the country. Senait was then expelled against her will from Ethiopia to Eritrea. Her whole family, save a sister who was allowed to emigrate to the United States via the visa lottery, was also expelled, one person at a time.

After a convoluted series of events including a two year stay in Eritrea for Senait and a brief reunion in South Africa, the two petitioned for refugee status in the United States by claiming past persecution and a well-founded fear of future persecution. The immigration judge ("IJ") and the BIA denied the petition. The government plans to deport Senait to Eritrea and Dawit to Ethiopia. They seek review of the BIA's order and a stay of their removal pending that review.

II.

Before directly addressing the request for a stay, we must determine, importantly, what standard governs that request. Neither the statutory text nor our caselaw provides an obvious guide. Although this court has yet to weigh in on the subject, this question has split the courts of appeals.[1] We now adopt the

standard in use by the vast majority of the circuits.

A.

Before 1996, most aliens who were ordered deported were entitled to a stay of their removal order pending review of that order.[2] With the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), however, one who is seeking review of a deportation order must ask the reviewing court for a stay of removal.[3] The statutory provision that repealed the automatic imposition of a stay provides, "Service of the petition on the officer does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise." *Id.* All the same, § 242(b)(3)(B) does *not* specify the standard a court should use in deciding whether to grant such a stay.

According to the government, that standard is found in § 242(f)(2):

Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by *clear and convincing evidence* that the entry or execution of such order is prohibited as a matter of law.

INA § 242(f)(2), 8 U.S.C. § 1252(f)(2) (em-

---

[1] *See Kenyeres v. Ashcroft*, 538 U.S. 1301, (continued...)

[1](...continued) 1305 (2003) (Kennedy, J., denying stay and discussing the divers authorities).

[2] *See* 8 U.S.C. § 1105a(a)(3) (repealed in 1996); *Arevalo v. Ashcroft*, 344 F.3d 1, 6 (1st Cir. 2003).

[3] *See* Immigration and Nationality Act ("INA") § 242(b)(3)(B), 8 U.S.C. § 1252(b)(3)(B).

phasis added). Consequently, the government contends, courts may not issue a stay unless the alien shows the illegality of the removal order by clear and convincing evidence. This approach, although proffered by the government in at least seven circuits, has been rejected by six and embraced in a holding by only one.[4]

The circuits that have rejected the government's position instead have adopted the standard that prevailed in this circuit before the enactment of IIRIRA, when stays were discretionary. In *Ignacio v. INS*, 955 F.2d 295, 299 (5th Cir. 1992), we held that the decision whether to grant a discretionary stay of deportation would be based on the familiar four-factor test applied to preliminary injunctions:

> (1) a likelihood of success on the merits; (2) that irreparable harm would occur if a stay is not granted; (3) that the potential harm to the [alien] outweighs the harm to the [government] if a stay is not granted; and (4) that the granting of the stay would serve the public interest.

*Id.* This standard is patently less demanding on petitioners than is the "clear and convincing evidence" standard urged by the government.[5]

As noted above, the Eleventh is the only circuit expressly to hold that § 242(f)(2)'s "clear and convincing evidence" standard has supplanted the traditional preliminary injunction standard when considering requests for temporary stays.[6] That court, in *Weng*, concluded that IIRIRA had amended the standard for aliens to satisfy before federal courts could temporarily stay their deportation.

Analyzing the statutory framework as a whole, the *Weng* court first noted that § 242-(f)(1) precludes courts from enjoining, class-wide, the operation of certain sections of the INA. Section 242(f)(2) goes on to explain that no court shall "enjoin" the removal of any individual alien except on a showing of clear and convincing evidence that the removal is unlawful.[7] The court noted that "enjoin"

---

[5](...continued) ponderance of the evidence and proof beyond a reasonable doubt'")). The government argues, in summary fashion, that the "clear and convincing evidence" standard found in § 242(f)(2) and adopted by the Eleventh Circuit controls here as well.

Missing from the government's discussion is a detailed refutation of the nuanced and reasonably persuasive arguments relied on by the other circuits that have rejected the position. The government's cursory discussion of the controlling standard is more than can be said for the petitioners' brief, however, which assumes that the old, four-factor test is still in use and does not even address the applicability of § 242(f)(2).

[6] In *dictum*, a panel of the Fourth Circuit indicated it would agree with the government's position. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 195 n.13 (4th Cir. 2004).

[7] As Judge Easterbrook puts it, "Subsection (f)(1) forbids injunctive class actions and subsec-(continued...)

---

[4] *See Weng v. U.S. Attorney Gen.*, 287 F.3d 1335, 1337 (11th Cir. 2002). *But see Bonhomme-Ardouin v. U.S. Attorney Gen.*, 291 F.3d 1289, 1290 (11th Cir. 2002) (Barkett, J., concurring) (calling for en banc reconsideration of *Weng*).

[5] *See Weng*, 287 F.3d at 1337; *Kenyeres*, 538 U.S. at 1305 (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("The 'intermediate standard of clear and convincing evidence' lies 'between a pre-(continued...)

3

means "'[t]o require; command; positively direct. To require a person by writ of injunction, to perform, or to abstain or desist from, some act.'" *Weng*, 287 F.3d at 1338 (quoting BLACK'S LAW DICTIONARY 529 (6th ed. 1990)). In comparison, "stay" is defined as

"[a] stopping; the act of arresting a judicial proceeding by the order of a court. Also that which holds, restrains, or supports. A stay is a suspension of the case or some designated proceedings within it. *It is a kind of injunction* with which a court freezes its proceedings at a particular point . . . ."

*Id.* (emphasis added by *Weng* court).

The *Weng* court thus concluded that the "definitions and common usage" of the words "enjoin" and "stay" demonstrate that "the plain meaning of enjoin includes the grant of a stay." *Id.* The court also found that the interchangeability of the two words is further supported by the frequent conflation of the two in other courts' phraseology. *Id.* (citing, *inter alia*, *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 139-41 (1971)).

Observing that before the enactment of IIRIRA courts considered requests for discretionary stays under the same standard as that employed for requests for injunctive relief,[8] the *Weng* court reasoned that Congress's passage of IIRIRA was informed by knowledge of this practice. Accordingly, *Weng* asserts that

Congress's "reference to the power to 'enjoin' should be read as encompassing stays of removal as well." *Id.* at 1339.

The belief that Congress's knowledge of current standards somehow broadens the definition of "enjoin" is a *non sequitur*. Nevertheless, the *Weng* court's first conclusion, that the plain meaning of "enjoin" as used in § 242(f)(2) encompasses courts' issuances of temporary stays, is persuasive. Other courts that have wrestled with this question, however, have employed equally compelling reasoning that runs counter to the government's position.

Faced with this dilemma, the First, Second, Third, Sixth, Seventh, and Ninth Circuits have held that the IIRIRA does not impose the "clear and convincing evidence" standard on requests for temporary stays.[9] In the most recent iteration of that position, the Seventh Circuit held that § 242(f)(2) does not supplant the traditional standard governing the issuance of stays. *Hor*, 400 F.3d at 483. Writing for the court, Judge Easterbrook observed that, as a practical matter, the adoption of the standard urged by the government would render stays of deportation almost impossible to obtain.

Section 242(f)(2), according to the government, precludes the issuance of a stay unless the alien demonstrates by clear and convincing evidence that the deportation order "is prohibited by law." Such a showing, how-

---

[7](...continued)
tion (f)(2) sets a high standard for injunctive relief at retail." *Hor v. Gonzales*, 400 F.3d 482, 483 (7th Cir. 2005).

[8] *See, e.g., Ignacio*, 955 F.2d at 299.

[9] *See Hor*, 400 F.3d at 485; *Douglas v. Ashcroft*, 374 F.3d 230, 234 (3d Cir. 2004); *Arevalo v. Ashcroft*, 344 F.3d 1, 8-9 (1st Cir. 2003); *Mohammed v. Reno*, 309 F.3d 95, 99-100 (2d Cir. 2002); *Bejjani v. INS*, 271 F.3d 670, 687-89 (6th Cir. 2001); *Andreiu v. Ashcroft*, 253 F.3d 477, 480-83 (9th Cir. 2001) (en banc).

ever, likely would be impossible for anyone but a United States citizen or the holder of "a visa of unquestioned validity." *Id.* Aliens who contend that the IJ's and BIA's denial of relief was unsupported by substantial evidence, however, would be unable to make such a showing of illegality and thus would have no hope of obtaining a stay. Such a conclusion would run counter to § 242(b)(3)(B)'s allowance for such stays by court order. *Id.*

This observation certainly does not conclusively demonstrate that the government's position is wrong. Absent certain exceptional circumstances, *e.g.*, an absurd result, we will not ignore the plain language of a statute. If the Eleventh Circuit is correct, therefore, that the plain language of § 242(f)(2) demands the result the government urges, the virtual impossibility that aliens like petitioners will receive a stay will not counsel against that interpretationSSfor such a result is not necessarily absurd.

A far more powerful refutation of the Eleventh Circuit's textual analysis concerns *Weng*'s conclusion that the word "enjoin" is unambiguously synonymous with "stay." As the Seventh Circuit acknowledges in *Hor*, 400 F.3d at 484, "[c]ertainly there is a functional overlap" of the twoSSboth can "stop an agency in its tracks." Nonetheless, history and usage counsel that the two words carry different legal meanings, particularly where federal agencies are involved. Though an injunction is relief obtained through independent litigation and directed at a particular party, not a tribunal, a stay is a mechanism intrinsic to judicial review. *Id.*

A court of appeals, just as it may stay a district court's order, may stay an agency's decision where the agency is the forum of initial decisionmaking and the "initial judicial tribunal is a court of appeals." *Id.* This historical distinction is reflected in rule 18 of the Federal Rules of Appellate Procedure, which recognizes the peculiar nature of "stays" pending appellate review of agency decisions. FED. R. APP. P. 18. It is noteworthy that rule 18 nowhere uses the word "enjoin" or "injunction" but maintains the linguistic distinction by discussing "stays"SSa peculiar procedural medium. *Id.*

Maintaining the formalistic distinction in vocabulary, Judge Easterbrook explains, is necessary to empower Congress to phrase legislation effectively. *Hor*, 400 F.3d at 484. Conflating the terms "injunctions" and "stays" "would impoverish the language and make the legislative task more difficult." *Id.* Strict adherence, on the other hand, to historical and practical differences in meanings makes the drafting of precise legislation more easily achievable.

> By contrast, treating a subsection that mentions injunctions but not stays as covering both would force Congress to add provisos each time it sought to regulate one but not the other. Once a legal community develops a stable nomenclature, it is best to apply it mechanically so that no one is taken unawares, and so that drafting can be uncluttered by provisos . . . .
>
> . . .[A]pplying established legal distinctions gives Congress a formulary: it can achieve one result by using a particular word or phrase, a different result with a different phrase.

*Id.* at 484-85. Interpreting the word "enjoin" narrowly so as to exclude "stays" is advisable "[n]ot because Congress is too unpoetic to use

synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting." *Reno v. Am.-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) (interpreting a different subsection of § 242).

There are other reasons for not assuming that subsection (f)(2)'s use of "enjoin" was meant to include stays. Subsection (b)(3)(B)'s abolition of the automatic stay specifically indicates that stays may still be available. INA § 242(b)(3)(B), 8 U.S.C. § 1252(b)(3)(B). This provision, consequently, would have been the natural place to locate an amendment to the operative standard governing their issuance, but no such standard is found. Rather than merely indicating that "such stays shall be issued when the standard laid out in subsection (f)(2) has been met," the provision is silent on the matter. Such silence, however, can be deafening.[10] Hesitating to make such an interpretive leap as urged by the government is consistent with the Supreme Court's admonition that § 242 should be construed narrowly. *See Am.-Arab Anti-Discrimination Committee*, 525 U.S. at 482.

Not only does subsection (b)(3)(B) not reference subsection (f)(2)'s supposedly higher applicable standard, but the two provisions employ different vocabulary. That is, although the *Weng* court is correct that a dictionary definition of "enjoin" can encompass a "stay," Congress chose to use different words in different sections. When Congress wished to

---

[10] *See Hor*, 400 F.3d at 484; *Arevalo*, 344 F.3d at 8 (citing *In re Qualitech Steel Corp.*, 327 F.3d 537, 548 (7th Cir. 2003) (counseling that courts should not "interpolate limitations from one statutory section into a different section when the legislature" did not so direct)).

legislate on the issue of stays, as it did when it repealed the imposition of the automatic stay pending appeal in subsection (b)(3)(B), it used the word "stay." As the Second Circuit observed, "If Congress wanted to apply a heightened standards to a stay pending appeal, it would likely have used the word 'stay' in subsection 242(f)(2) instead of 'enjoin' . . . ." *Mohammed*, 309 F.3d at 99.

The practical consequence of adopting the government's position also counsels in favor of rejecting that position. Imposing on petitioners the "clear and convincing evidence" standard of subsection (f)(2) would, as Judge Selya described it, "necessitate full deliberation on the merits of the underlying case and, in the bargain, require the alien to carry a burden of proof *higher* than she would have to carry on the merits." *Arevalo*, 344 F.3d at 8.

The instant petition for review, far from requiring clear and convincing evidence of illegality to be successful, will be granted should this court ultimately decide, on a *de novo* merits review, that the BIA erred in its legal conclusions. *See Lopez-Gomez v. Ashcroft,* 263 F.3d 442, 444 (5th Cir. 2001). Convinced that Congress could not have intended this "Kafka-esque" result, the First Circuit held that subsection (f)(2) does not apply to requests for temporary stays. *Id.* Although we do not necessarily agree with Judge Selya's contention that such a result renders the statute "absurd," it is strong evidence that the intent of Congress was otherwise. *Id.*

Similarly, the Seventh Circuit highlighted another potential anomaly that would flow from the adoption of the government's position. *See Hor*, 400 F.3d at 485. In contrast to the potential mootness effects that pre-IIRIRA deportations yielded, current law allows a petition for review to be considered even after

an alien's departure. The alien may then return to the United States should he prevail on appeal. *See id.* In cases such as the present one, however, where petitioners are seeking asylum based on a well-founded fear of persecution, "[t]he ability to come back to the United States would not be worth much if the alien has been maimed or murdered in the interim." *Id.*

Reading the relevant statutory provisions as the government contends yields just this sort of peril. The results of such a construction are peculiar, at best, but "[t]here's nothing absurd about reading [§ 242(b)(3)(B)] to permit courts to avert such harms." *Id.*

It is axiomatic that courts should strive to give operative meaning to every word in a statute. *See, e.g., Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 209 (1997). Accordingly, some courts have highlighted the fact that although § 242(f)(2) employs the word "enjoin," the preceding subsection discusses courts' abilities to "enjoin or restrain." *Andreiu*, 253 F.3d at 480 (quoting INA § 242(f)(1), 8 U.S.C. § 1252(f)(1)). Consequently, goes the argument, adopting the government's position that subsection (f)(2)'s use of "enjoin" encompasses all related phrases such as "stay" would reduce Congress's use of "restrain" in the previous subsection to mere surplusage.

Although that particular "mere surplusage" argument is not especially convincing (and it would be stronger if the prior subsection used "enjoin or *stay*" instead of "enjoin or restrain"), a related argument is more powerful. The Ninth Circuit en banc court noted that if § 242(f)(2) truly had the effect that the government advances, all of subsection (b)(3)(B) would be surplusage. *See Andreiu*, 253 F.3d

at 481. "If [§ 242(f)(2)] clearly means that courts can only issue stays of deportation upon a showing that the order was 'prohibited as a matter of law,' there would be no need to state in [§ 242(b)(3)(B)] that stays are not automatic." *Id.*

With due respect to the Eleventh Circuit, the better reading of § 242 of the INA is that subsection 242(f)(2)'s "clear and convincing evidence" standard does not apply to requests for temporary stays of removal pending appellate review. Instead, the traditional test, adopted by this court in *Ignacio*, 955 F.2d at 299, remains in force and governs the instant dispute. With the rule of decision so clarified, we now turn to the merits of petitioners' request for a stay.

III.

As we have said, in the absence of legislative guidance to the contrary, requests for temporary stays of removal are considered in light of the degree to which four factors can be shown:

> (1) a likelihood of success on the merits; (2) that irreparable harm would occur if a stay is not granted; (3) that the potential harm to the [alien] outweighs the harm to the [government] if a stay is not granted; and (4) that the granting of the stay would serve the public interest.

*Id.* The petitioners' motion papers make a strong argument in favor of granting the stay. These showings are balanced only by the government's cursory refutations. Stays, like other forms of preliminary relief, are considered without reaching a full adjudication on

the merits.[11] They are, in fact, usually issued or denied without even full briefing on the merits.[12] At this incipient stage, petitioners have made out a strong enough case to warrant relief in the form of a temporary stay of removal pending our review on the merits of their petition.

Although four factors are relevant to determining entitlement to a stay, the first (likelihood of success on the merits) is arguably the most important. *See Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). Because the instant petitioners can show a significant likelihood of success on the merits, therefore, their case is a particularly appropriate one in which to issue a stay.

The IJ and the BIA ruled that petitioners did not present documentary proof of Ethiopian law that would have supported their assertion that Ethiopian law recognizes their marriage despite the fact that it has never been formalized. Although they submitted copies of provisions of the Ethiopian constitution to support their position, the IJ held that such evidence was insufficient to demonstrate marriage because the petitioners did "not show[] that they are experts in Ethiopian law." The BIA parroted this line of reasoning when it concluded that Dawit would not likely face future persecution because his marriage to Senait was not registered with the Ethiopian government.

There does not seem to be any support in the law, however, for the conclusion that the petitioners' testimony, coupled with copies of the operative sections of the Ethiopian constitution, is not sufficient to demonstrate the veracity of their marriage. This is especially so given the IJ's explicit recognition of the credibility of the petitioners' testimony.[13] There appears to be no tenet of law (to which any party directs the court's attention) that requires any sort of expertise to testify to this fact. Consequently, the BIA's conclusion that Dawit was not subject to persecution by Senait's deportation because, in part, their marriage was not registered, was likely error.

An even more important point on which the IJ and BIA seem to have erred involves Senait's alleged resettlement in Eritrea. The board found that she was not entitled to asylum based on any persecution in Ethiopia, for she had firmly resettled in Eritrea. To the contrary, the evidence appears to be that she had no intention of ever remaining in Eritrea and only stayed there so long as was necessary to arrange onward travel. In point of fact, she entered Eritrea only because she was forcibly deported there (after being arrested for trying to enter Kenya with Dawit), and was thereafter denied the ability to exit by the Eritrean government even though she had obtained a visa to enter South Africa (where she would eventually reunite with Dawit).

The case the IJ and BIA cite in support of the "firmly resettled" conclusion does little to advance this finding. *See Mussie v. INS*, 172 F.3d 329, 331 (4th Cir. 1999). Although the

---

[11] *See* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2947, at 122 (2d ed. 2003).

[12] That is all the more reason that the supposed requirement that a petitioner show entitlement to relief by "clear and convincing evidence" would be anomalous.

[13] *See* IJ opinion at 21 (calling their testimony "specific, forthright, internally consistent and essentially consistent with the testimony of the other . . . .").

BIA's regulations state that where an applicant for asylum entered a country as a necessary consequence of her persecution and remained only as long as was necessary to arrange onward travel, the case to which the BIA cites involved a situation in which there was no colorable argument that these requirements had been met. *See* 8 C.F.R. § 208.15; *Mussie*, 172 F.3d at 331. In contrast to the present case, where it is at least a close question whether Senait remained only so long as was necessary to arrange onward travel (although not that close given the evidence that the Eritrean government denied her ability to exit and reunite with Dawit), *Mussie* involved an Ethiopian asylum seeker who had spent over six years in Germany and did not attempt to leave until she was harassed by neo-Nazis. *Mussie*, 172 F.3d at 331.

The BIA further concluded that Dawit had not suffered past persecution, because his fear of imprisonment in Ethiopia for attempting to smuggle Senait out of the country was the result of legitimate application of Ethiopian travel laws and not the result of one of the five bases of persecution from which refugees are protected: race, political beliefs, religion, nationality, and membership in a particular social group. 8 U.S.C. § 1101(a)(42)(A); *Zhao v. Gonzales*, 404 F.3d 295, 304 (5th Cir. 2005). Though it may be a close question, there is a strong argument that prosecution for the crime of smuggling an Eritrean, especially where the Eritrean in question is one's wife from whom one would otherwise be forcibly separated by a war zone, is persecution based on race, political belief, and membership in a social group.

Courts have consistently held that legitimate application of a country's travel laws does not constitute persecution. Nevertheless, those cases have never involved a peculiar application of travel laws such that the violative behavior was caused by the patent persecution of the ethnicity of the asylum-seekers wife. It is not a compelled conclusion that under the statute Dawit faces "persecution," as defined by the statute, for his violation of the travel laws. It is obvious, however, that the cases on which the BIA concluded that it was not persecution are distinguishable on their facts and do not stand for the proposition that asylum-seekers positioned as Dawit is are unable to claim persecution.

There is also a serious question as to the propriety of the BIA's conclusion that Dawit likely could emigrate to Eritrea to be with Senait (who has already been forcibly deported from Ethiopia, so her emigration there is obviously not possible). As the petitioners' expert put it, such a suggestion "amounts to a kind of insanity." At this early stage in our proceedings, it is sufficient to say that the BIA's conclusion to the contrary is questionable and demonstrates that there exists a significant likelihood that Senait and Dawit will prevail on the merits of their claims.

Again, this is not an exhaustive analysis of the merits of the petitioners' claims; such an analysis would not be appropriate at this initial stage without the benefit of full briefing and further review of the record and pertinent authorities. The petitioners, however, have demonstrated a significant likelihood of success on the merits. That likelihood, coupled with the extraordinary likelihood of irreparable harm the petitioners face if deported (in the form of forced separation and likely persecution), and the public interest in having the immigration laws applied correctly and even-handedly, justifies the issuance of a stay of the order of removal pending resolution of the

merits of the petition for review.

The motion for stay of removal pending review is GRANTED. We emphasize, however, that our comments on the merits are preliminary. Another panel of this court will review anew the facts and the law for a purpose entirely different from the reason for which we have examined them. Nothing in this opinion should be interpreted as an indication that petitioners can, will, or should prevail in ultimately forestalling removal and gaining asylum.