(Slip Opinion)     OCTOBER TERM, 2005     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FERNANDEZ-VARGAS *v.* GONZALES, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 04–1376.   Argued March 22, 2006—Decided June 22, 2006

Immigration law has for some time provided that an order for removing an alien present unlawfully may be reinstated if he leaves and unlawfully reenters. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) amended the Immigration and Nationality Act (INA) to enlarge the class of illegal reentrants whose orders may be reinstated and limit the possible relief from a removal order available to them. See §241(a)(5), 8 U. S. C. §1235(a)(5). Petitioner Fernandez-Vargas, a Mexican citizen, illegally reentered the United States in 1982, after having been deported. He remained undetected for over 20 years, fathering a son in 1989 and marrying the boy's mother, a United States citizen, in 2001. After he filed an application to adjust his status to that of a lawful permanent resident, the Government began proceedings to reinstate his 1981 deportation order under §241(a)(5), and deported him. He petitioned the Tenth Circuit to review the reinstatement order, claiming that, because he illegally reentered the county before IIRIRA's effective date, §241(a)(5) did not bar his application for adjustment of status, and that §241(a)(5) would be impermissibly retroactive if it did bar his adjustment application. The court held that §241(a)(5) barred his application and followed *Landgraf* v. *USI Film Products,* 511 U. S. 244, in determining that the new law had no impermissibly retroactive effect in his case.

*Held:* Section 241(a)(5) applies to those who reentered the United States before IIRIRA's effective date and does not retroactively affect any right of, or impose any burden on, the continuing violator of the INA now before this Court. Pp. 5–16.

  (a) Statutes are disfavored as retroactive when their application

"would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf, supra,* at 280. A statute is not given retroactive effect "unless such construction is required by explicit language or by necessary implication." *United States* v. *St. Louis, S. F. & T. R. Co.,* 270 U. S. 1, 3. In determining whether a statute has an impermissibly retroactive effect, the Court first looks to "whether Congress has expressly prescribed the statute's proper reach," *Landgraf, supra,* at 280, and in the absence of express language tries to draw a comparably firm conclusion about the temporal reach specifically intended by applying its "normal rules of construction," *Lindh* v. *Murphy,* 521 U. S. 320, 326. If that effort fails, the Court asks whether applying the statute to the person objecting would have a retroactive effect in the disfavored sense of "affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment," *Landgraf, supra,* at 278. If the answer is yes, the Court then applies the presumption against retroactivity by construing the statute as inapplicable to the event or act in question. *INS* v. *St. Cyr,* 533 U. S. 289, 316. Pp. 5–7.

(b) Common principles of statutory interpretation fail to unsettle §241(a)(5)'s apparent application to any reentrant present in the country, whatever the date of return. The statute does not expressly include in or exclude from §241(a)(5)'s ambit individuals who illegally entered the country before IIRIRA's effective date. Fernandez-Vargas argues that the fact that the old reinstatement provision applied to aliens who had "unlawfully reentered . . . after having previously departed or been deported . . . , whether before or after June 27, 1952 [the INA's effective date], on any ground described in . . . subsection (e)," §242(f), while §241(a)(5) lacks language of temporal reach, shows that Congress no longer meant to cover preenactment reentrants. But the old before-or-after clause, which was sandwiched between references to departure or deportation and grounds for deportation, most naturally referred not to an alien's illegal reentry but to the previous deportation or departure. The better inference is that the clause was removed because, in 1996, application keyed to departures in 1952 or earlier was academic. Applying §241(a)(5) only to deportations or departures after IIRIRA's effective date would exempt anyone who departed before that date but reentered after it. That would be a strange result, since the statute was revised to expand the scope of the reinstatement authority and invest it with something closer to finality. Fernandez-Vargas errs in suggesting that the new law is bereft of clarity and the Court should apply the presumption against retroactivity as a tool for interpreting the statute at the first *Landgraf* step. It is not until a statute is shown to

have no firm provision about temporal reach but to produce a retroactive effect when straightforwardly applied that the presumption has its work to do. And IIRIRA has other provisions on temporal reach, which blunt Fernandez-Vargas's argument that a negative inference in his favor may be drawn from removal of the before-or-after clause. Pp. 7–10.

(c) This facial reading is confirmed by two features of IIRIRA. First, the provision's text shows that it applies here not because Fernandez-Vargas reentered at any particular time, but because he chose to remain after the new statute became effective. While the law looks back to "an alien [who] has reentered . . . illegally," 8 U. S. C. §1231(a)(5), the provision does not penalize an alien for the reentry; it establishes a process to remove him under a "prior order any time after the reentry," *ibid.* Thus, it is the conduct of remaining in the country after entry that is the predicate action; the law applies to stop an indefinitely continuing violation that the alien could end at any time by voluntarily leaving. It is therefore the alien's choice to continue his illegal presence, after illegal reentry and after the new law's effective date, that subjects him to the new and less generous regime, not a past act that is he helpless to undo. *INS* v. *St. Cyr, supra,* distinguished. Second, IIRIRA's effective date provision shows that Fernandez-Vargas had ample warning of the coming change in the law, but chose to remain until the old regime expired and §241(a)(5) took its place. He had an opportunity to avoid the new law's application by leaving the country and ending his violation during the 6 months between IIRIRA's enactment and effective date. For that matter, he could have married his son's mother and applied for adjustment of status during the period, in which case he would at least have had a claim that proven reliance on the law should be honored by applying the presumption against retroactivity. Instead, he augmented his 15 years of unlawful presence by remaining in the country into the future subject to the new law. And the presumption against retroactivity does not amount to a presumption of legal stasis for the benefit of continuous lawbreakers. Pp. 11–15.

394 F. 3d 881, affirmed.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 04–1376

## HUMBERTO FERNANDEZ-VARGAS, PETITIONER *v.* ALBERTO R. GONZALES, ATTORNEY GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

### [June 22, 2006]

JUSTICE SOUTER delivered the opinion of the Court.

For some time, the law has provided that an order for removing an alien present unlawfully may be reinstated if he leaves and unlawfully enters again. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104–208, div. C, 110 Stat. 3009–546, enlarged the class of illegal reentrants whose orders may be reinstated and limited the possible relief from a removal order available to them. See Immigration and Nationality Act (INA), §241(a)(5), 66 Stat. 204, as added by IIRIRA §305(a)(3), 110 Stat. 3009–599, 8 U. S. C. §1231(a)(5). The questions here are whether the new version of the reinstatement provision is correctly read to apply to individuals who reentered the United States before IIRIRA's effective date, and whether such a reading may be rejected as impermissibly retroactive. We hold the statute applies to those who entered before IIRIRA and does not retroactively affect any right of, or impose any burden on, the continuing violator of the INA now before us.

I

In 1950, Congress provided that deportation orders issued against some aliens who later reentered the United States illegally could be reinstated.[1]  Internal Security Act of 1950, §23(d), 64 Stat. 1012, 8 U. S. C. §156(d) (1946 ed., Supp. V).[2]  Only specific illegal reentrants were subject to the provision, those deported as "anarchists" or "subversives," for example, see §23(c), 64 Stat. 1012, while the rest got the benefit of the ordinary deportation rules. Congress retained a reinstatement provision two years later when it revised the immigration laws through the INA, §242(f), 66 Stat. 212, as codified in this subsection:

> "Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether before or after June 27, 1952,[3] on any ground described in subsection (e) . . . , the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry."  8 U. S. C. §1252(f) (1994 ed.).

———————

[1] What was formerly known as "deportation" is now called "removal" in IIRIRA.  See Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 966 (1998) (IIRIRA "realigned the vocabulary of immigration law, creating a new category of 'removal' proceedings that largely replaces what were formerly exclusion proceedings and deportation proceedings").  Our use of each term here will vary according to the scheme under discussion.

[2] This is the full text of the provision: "Should any alien subject to the provisions of subsection (c) unlawfully return to the United States after having been released for departure or deported pursuant to this section, the previous warrant of deportation against him shall be considered as reinstated from its original date of issuance."

[3] A date was inserted when the provision was codified; as originally enacted, the text read, "whether before or after the date of enactment of this Act."  66 Stat. 212.

Again, only a limited class of illegal reentrants was susceptible, see §242(e), 66 Stat. 211; cf. §241(a), *id.,* at 204, and even those affected could seek some varieties of discretionary relief, see, *e.g.,* 8 U. S. C. §1254(a)(1) (1994 ed.) (suspension of deportation available to aliens who maintained a continuous presence in the United States for seven years and could demonstrate extreme hardship and a good moral character).

In IIRIRA, Congress replaced this reinstatement provision with one that toed a harder line, as the old §242(f) was displaced by the new §241(a)(5):

> "If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry." 8 U. S. C. §1231(a)(5) (1994 ed., Supp. III).

The new law became effective on April 1, 1997, "the first day of the first month beginning more than 180 days after" IIRIRA's enactment. §309(a), 110 Stat. 3009–625. Unlike its predecessor, §241(a)(5) applies to all illegal reentrants, explicitly insulates the removal orders from review, and generally forecloses discretionary relief from the terms of the reinstated order.[4]

––––––––

[4] Notwithstanding the absolute terms in which the bar on relief is stated, even an alien subject to §241(a)(5) may seek withholding of removal under 8 U. S. C. §1231(b)(3)(A) (2000 ed.) (alien may not be removed to country if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion"), or under 8 CFR §§241.8(e) and 208.31 (2006) (raising the possibility of asylum to aliens

## II

Humberto Fernandez-Vargas is a citizen of Mexico, who first came to the United States in the 1970s, only to be deported for immigration violations, and to reenter, several times, his last illegal return having been in 1982. Then his luck changed, and for over 20 years he remained undetected in Utah, where he started a trucking business and, in 1989, fathered a son, who is a United States citizen. In 2001, Fernandez-Vargas married the boy's mother, who is also a United States citizen. She soon filed a relative-visa petition on behalf of her husband, see 8 U. S. C. §§1154(a), 1151(b) (2000 ed.); see *Fernandez-Vargas* v. *Ashcroft,* 394 F. 3d 881, 883, n. 4 (CA10 2005), on the basis of which he filed an application to adjust his status to that of lawful permanent resident, see §1255(i). The filings apparently tipped off the authorities to his illegal presence here, and in November 2003, the Government began proceedings under §241(a)(5) that eventuated in reinstating Fernandez-Vargas's 1981 deportation order, but without the possibility of adjusting his status to lawful residence. He was detained for 10 months before being removed to Juarez, Mexico in September 2004.

Fernandez-Vargas petitioned the United States Court of Appeals for the Tenth Circuit to review the reinstatement order. He took the position that because he illegally reentered the country before IIRIRA's effective date, the controlling reinstatement provision was the old §242(f), which meant he was eligible to apply for adjustment of status as spouse of a citizen, and he said that the new §241(a)(5) would be impermissibly retroactive if it barred his application for adjustment. The Court of Appeals held that §241(a)(5) did bar Fernandez-Vargas's application and followed *Landgraf* v. *USI Film Products,* 511 U. S. 244 (1994), in determining that the new law had no impermissi-

─────────

whose removal order has been reinstated under INA §241(a)(5)).

bly retroactive effect in Fernandez-Vargas's case. 394 F. 3d, at 886, 890–891. We granted certiorari to resolve a split among the Courts of Appeals over the application of §241(a)(5) to an alien who reentered illegally before IIRIRA's effective date,[5] 546 U. S. \_\_\_ (2005), and we now affirm.

## III

Statutes are disfavored as retroactive when their application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf, supra*, at 280. The modern law thus follows Justice Story's definition of a retroactive statute, as "tak[ing] away or impair[ing] vested rights acquired under existing laws, or creat[ing] a new obligation, impos[ing] a new duty, or attach[ing] a new disability, in respect to transactions or considerations already past," *Society for the Propagation of the Gospel* v. *Wheeler,* 22 F. Cas. 756, 767 (No. 13,156) (CCNH 1814). Accordingly, it has become "a rule of general application" that "a

---

[5] Two Courts of Appeals have held that §241(a)(5) does not apply at all to aliens who reentered before the provision's effective date, see *Bejjani* v. *INS,* 271 F. 3d 670 (CA6 2001); *Castro-Cortez* v. *INS,* 239 F. 3d 1037 (CA9 2001), while eight have held that it does, at least in some circumstances, see *Arevalo* v. *Ashcroft,* 344 F. 3d 1 (CA1 2003); *Avila-Macias* v. *Ashcroft,* 328 F. 3d 108 (CA3 2003); *Velasquez-Gabriel* v. *Crocetti,* 263 F. 3d 102 (CA4 2001); *Ojeda-Terrazas* v. *Ashcroft,* 290 F. 3d 292 (CA5 2002); *Faiz-Mohammad* v. *Ashcroft,* 395 F. 3d 799 (CA7 2005); *Alvarez-Portillo* v. *Ashcroft,* 280 F. 3d 858 (CA8 2002); 394 F. 3d 881 (CA10 2005) (case below); *Sarmiento Cisneros* v. *United States Attorney General,* 381 F. 3d 1277 (CA11 2004). The Courts of Appeals in the majority are themselves divided on the question whether an alien's marriage or application for adjustment of status before the statute's effective date (facts not in play here) renders the statute impermissibly retroactive when it is applied to the alien. See, *e.g., Faiz-Mohammad, supra,* at 809–810 (application for adjustment of status); *Alvarez-Portillo, supra,* at 862, 867 (marriage).

statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication." *United States* v. *St. Louis, S. F. & T. R. Co.,* 270 U. S. 1, 3 (1926) (opinion for the Court by Brandeis, J.).

This Court has worked out a sequence of analysis when an objection is made to applying a particular statute said to affect a vested right or to impose some burden on the basis of an act or event preceding the statute's enactment. We first look to "whether Congress has expressly prescribed the statute's proper reach," *Landgraf, supra,* at 280, and in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying "our normal rules of construction," *Lindh* v. *Murphy,* 521 U. S. 320, 326 (1997). If that effort fails, we ask whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of "affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment," *Landgraf, supra,* at 278; see also *Lindh, supra,* at 326. If the answer is yes, we then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question owing to the "absen[ce of] a clear indication from Congress that it intended such a result." *INS* v. *St. Cyr,* 533 U. S. 289, 316 (2001); see *Martin* v. *Hadix,* 527 U. S. 343, 352 (1999) (quoting *Landgraf, supra,* at 280).

Fernandez-Vargas fights at each step of the way, arguing that Congress intended that INA §241(a)(5) would not apply to illegal reentrants like him who returned to this country before the provision's effective date; and in any event, that application of the provision to such illegal reentrants would have an impermissibly retroactive effect, to be avoided by applying the presumption against it. We

are not persuaded by either contention.[6]

## A

Needless to say, Congress did not complement the new version of §241(a)(5) with any clause expressly dealing with individuals who illegally reentered the country before IIRIRA's April 1, 1997, effective date, either including them within §241(a)(5)'s ambit or excluding them from it. Fernandez-Vargas argues instead on the basis of the generally available interpretive rule of negative implication, when he draws attention to language governing temporal reach contained in the old reinstatement provision, but missing from the current one. Section 242(f) applied to "any alien [who] has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether before or after June 27, 1952, on any ground described in . . . subsection (e)." 8 U. S. C. §1252(f) (1994 ed.). According to Fernandez-Vargas, since that before-or-after clause made it clear that the statute applied to aliens who reentered before the enactment date of the earlier version, its elimination in the current iteration shows that Congress no longer meant to cover preenactment reentrants. See *Brewster* v. *Gage,* 280 U. S. 327, 337 (1930) ("deliberate selection of language . . . differing from that used in the earlier Acts" can indicate "that a change of law was in-

_____

[6] The Government urges us to forgo *Landgraf* analysis altogether because §241(a)(5) regulates only a present removal process, not past primary conduct, citing our recent decision in *Republic of Austria* v. *Altmann,* 541 U. S. 677 (2004). Although we ultimately agree with the Government, in the abstract at least, that the reinstatement provision concerns itself with postenactment affairs, see *infra*, at 13–15, we find the Government's allusion to *Altmann* inapt. The Court's conclusion in that case, that *Landgraf* was to be avoided, turned on the peculiarities of the Foreign Sovereign Immunities Act. See *Altmann, supra*, at 694–696. Those peculiarities are absent here, and we thus advert to *Landgraf*, as we ordinarily do.

tended"); cf. 2B N. Singer, Statutes and Statutory Construc-
tion §51.04, p. 244 (6th rev. ed. 2000). But the clues are not
that simple.

To begin with, the old before-or-after clause was sand-
wiched between references to departure or deportation
under a deportation order and to grounds for deportation
set out in a different subsection of the INA. It thus most
naturally referred not to the illegal reentry but to the
alien's previous deportation or departure. If its omission
from the new subsection (a)(5) is significant, its immediate
significance goes to the date of leaving this country, not
the date of illegal return. Since the old clause referred to
the date of enactment of the INA in 1952, the negative
implication argument from dropping the language is that
the reinstatement section no longer applies to those who
left the country before that date. But, in 1996, application
keyed to departures in 1952 or earlier was academic, and
the better inference is that the clause was removed for
that reason.[7]

If, moreover, we indulged any suggestion that omitting
the clause showed an intent to apply §241(a)(5) only to
deportations or departures after IIRIRA's effective date,
the result would be a very strange one: it would exempt
from the new reinstatement provision's coverage anyone
who departed before IIRIRA's effective date but reentered
after it. The point of the statute's revision, however, was
obviously to expand the scope of the reinstatement author-
ity and invest it with something closer to finality, and it
would make no sense to infer that Congress meant to
except the broad class of persons who had departed before
the time of enactment but who might return illegally at
some point in the future.

─────────

[7] We therefore need not entertain Fernandez-Vargas's argument that
the provision's drafting history indicates that the language was elimi-
nated deliberately.

Fernandez-Vargas sidesteps this problem (on a very generous reading of his argument) by making a more general suggestion of congressional intent: whatever the event to which the old law was tied, activity before as well as activity after it implicated the reinstatement power. Since the new law is bereft of such clarity, we should apply the "'longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien,'" *St. Cyr,* 533 U. S., at 320 (quoting *INS* v. *Cardoza-Fonseca,* 480 U. S. 421, 449 (1987)), which would effectively impose "[t]he presumption against retroactive application of ambiguous statutory provisions," *St. Cyr, supra*, at 320. If we did so, we would find that §241(a)(5) operates only to reentries after its effective date.

Even at this amorphously general level, however, the argument suffers from two flaws, the first being that it puts the cart before the horse. As Fernandez-Vargas realizes, he urges application of the presumption against retroactivity as a tool for interpreting the statute at the first *Landgraf* step. But if that were legitimate, a statute lacking an express provision about temporal reach would never be construed as having a retroactive potential and the final two steps in the *Landgraf* enquiry would never occur (that is, asking whether the statute would produce a retroactive effect, and barring any such application by applying the presumption against retroactivity). It is not until a statute is shown to have no firm provision about temporal reach but to produce a retroactive effect when straightforwardly applied that the presumption has its work to do. See 511 U. S., at 280.

The second flaw is the argument's failure to account for the new statute's other provisions on temporal reach, from which one might draw a negative inference that subsection (a)(5) was (or at least may well have been) meant to apply to reentries before its effective date. In contrast to their silence about the temporal sweep of §241(a)(5), the

1996 amendments speak directly to the scope of changes in provisions making reentry criminal and setting civil penalties. IIRIRA §324(c), 110 Stat. 3009–629, note following 8 U. S. C. §1326 (2000 ed.), provides that the expanded criminal prohibitions, see §1326(a), apply only to reentries or attempts after the effective date, and §105(b), 110 Stat. 3009–556, note following 8 U. S. C. §1325, provides the same as to civil penalties for illegal reentry, see §1325(b). The point here is not that these provisions alone would support an inference of intent to apply the reinstatement provision retroactively, see *Lindh,* 521 U. S., at 328, n. 4, for we require a clear statement for that, see *Martin,* 527 U. S., at 354. But these provisions do blunt any argument that removal of the before-or-after clause suffices to establish the applicability of §241(a)(5) only to posteffective date reentries. The fact is that IIRIRA sometimes expressly made changes prospective as from its effective date and sometimes expressly provided they were applicable to earlier acts; compare §§324(c) and 105(b), with §347(c), 110 Stat. 3009–639 (provision governing removal of aliens who have unlawfully voted is applicable "to voting occurring before, on, or after the date of the enactment of this Act"), and §351(c), *id.,* at 3009–640 (provision applicable to "waivers filed before, on, or after the date of the enactment of this Act"). With such a variety of treatment, it is just too hard to infer any clear intention at any level of generality from the fact of retiring the old before-or-after language from what is now §241(a)(5).

One conclusion can be stated, however. Common principles of statutory interpretation fail to unsettle the apparent application of §241(a)(5) to any reentrant present in the country, whatever the date of return.[8]

_____

[8] JUSTICE STEVENS states that when, in 1952, Congress inserted the before-or-after clause with the old §242(f), it was responding to the Immigration and Naturalization Service (INS) practice of applying the

## B

This facial reading is confirmed by two features of IIRIRA, not previously discussed, that describe the conduct to which §241(a)(5) applies, and show that the application suffers from no retroactivity in denying Fernandez-Vargas the opportunity for adjustment of status as the spouse of a citizen of the United States.[9] One is in the text of that provision itself, showing that it applies to Fernandez-Vargas today not because he reentered in 1982 or at any other particular time, but because he chose to remain after the new statute became effective. The second is the provision setting IIRIRA's effective date, §309(a), 110 Stat. 3009–625, which shows that Fernandez-Vargas had an ample warning of the coming change in the law, but chose

---

reinstatement provision only to deportation orders issued after the provision's enactment, a practice that necessarily meant INS applied the provision only to postenactment reentries. By correcting the INS's interpretation only as to deportation orders, JUSTICE STEVENS suggests, Congress did nothing to disturb the practice as to reentries. And when it removed the obsolete before-or-after clause in 1996 without adding alternative language of temporal reach, the argument goes, Congress held fast to its intent in 1950 and 1952 to apply the reinstatement provision only to postenactment reentries. But the INS's practice circa 1951 of applying the reinstatement provision only to postenactment reentries followed from its policy regarding deportation orders, and in 1952 Congress might just as easily have assumed that the branch would go the way of the root. In any event, it is difficult to accept JUSTICE STEVENS's view that congressional understanding from 40 years back was intended to govern the IIRIRA reinstatement provision, given Congress's care to make the revised criminal and civil penalties applicable only to postenactment reentries.

[9] We would reach the same conclusion about denial of opportunities to apply for permission for voluntary departure as an alternative to removal, see 8 U. S. C. §1229c, and about cancellation of removal, see §1229b(b), if there were a need to deal with these matters separately. Although Fernandez-Vargas argues that he is being denied the chance to seek these forms of relief, he never applied for either of them and has not formally attempted to claim them in response to the reinstatement and removal proceedings.

to remain until the old regime expired and §241(a)(5) took its place.

As a preface to identifying the conduct by Fernandez-Vargas to which the reinstatement provision applies (the conduct that results in reinstating the old deportation order without the former opportunities to seek adjustment of status), a look at our holding in *St. Cyr*, 533 U. S. 289, is helpful. The alien, St. Cyr, was a lawful, permanent resident who made a plea agreement and pleaded guilty to an aggravated felony charge. Although the resulting conviction justified his deportation, when he entered his plea the law allowed him to seek a waiver of deportation at the discretion of the Attorney General. Between the plea and deportation proceedings, however, IIRIRA and another statute repealed the provision for that discretionary relief, converting deportation from a possibility to a certainty. *Id.,* at 325. The question was whether *Landgraf* barred application of the new law eliminating discretionary relief, on the ground that applying it to a defendant who pleaded guilty before the enactment of the new law would attach a further burdensome consequence to his plea, amounting to "a new disability, in respect to transactions or considerations already past," 533 U. S., at 321 (internal quotation marks omitted). The answer was that converting deportation from a likely possibility to a dead certainty would add such a burden, and application of the new law was accordingly barred. *Id.,* at 325. In making this "commonsense, functional judgment," *Martin, supra,* at 357, we emphasized that plea agreements "involve a *quid pro quo* between a criminal defendant and the government," *St. Cyr,* 533 U. S., at 321, in which a waiver of "constitutional rights (including the right to a trial)," had been exchanged for a "perceived benefit," *id.,* at 322, which in practical terms was valued in light of the possible discretionary relief, a focus of expectation and reliance, *id.,* at 323.

St. Cyr's agreement for a *quid pro quo* and his plea were entirely past, and there was no question of undoing them, but the "transactio[n] or consideratio[n]" on which §241(a)(5) turns is different.[10] While the law looks back to a past act in its application to "an alien [who] has reentered . . . illegally," 8 U. S. C. §1231(a)(5), the provision does not penalize an alien for the reentry (criminal and civil penalties do that); it establishes a process to remove him "under the prior order at any time after the reentry." *Ibid.* Thus, it is the conduct of remaining in the country after entry that is the predicate action; the statute applies to stop an indefinitely continuing violation that the alien himself could end at any time by voluntarily leaving the country. It is therefore the alien's choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subjects him to the new and less generous legal regime, not a past act that he is helpless to undo up to the moment the Government finds him out.

That in itself is enough to explain that Fernandez-Vargas has no retroactivity claim based on a new disabil-

---

[10] We understand Fernandez-Vargas's claim as falling within the second of Justice Story's categories of retroactivity (new consequences of past acts), not the first category of canceling vested rights. The forms of relief identified by Fernandez-Vargas as rendered unavailable to him by §241(a)(5) include cancellation of removal, see 8 U. S. C. §1229b(b), adjustment of status, see §1255, and voluntary departure, see §1229c. These putative claims to relief are not "vested rights," a term that describes something more substantial than inchoate expectations and unrealized opportunities. In contrast to "an immediate fixed right of present or future enjoyment," *Pearsall* v. *Great Northern R. Co.,* 161 U. S. 646, 673 (1896) (internal quotation marks omitted), Fernandez-Vargas's claim to such relief was contingent, and it was up to him to take some action that would elevate it above the level of hope. It is not that these forms of relief are discretionary, cf. *St. Cyr,* 533 U. S., at 325; it is rather that before IIRIRA's effective date Fernandez-Vargas never availed himself of them or took action that enhanced their significance to him in particular, as St. Cyr did in making his *quid pro quo* agreement, see *supra*, at 11–12.

ity consequent to a completed act, but in fact his position is weaker still.  For Fernandez-Vargas could not only have chosen to end his continuing violation and his exposure to the less favorable law, he even had an ample warning that the new law could be applied to him and ample opportunity to avoid that very possibility by leaving the country and ending his violation in the period between enactment of §241(a)(5) and its effective date.  IRRIRA became law on September 30, 1996, but it became effective and enforceable only on "the first day of the first month beginning more than 180 days after" IIRIRA's enactment, that is, April 1, 1997.  §309(a), 110 Stat. 3009–625.  Unlawful alien reentrants like Fernandez-Vargas thus had the advantage of a grace period between the unequivocal warning that a tougher removal regime lay ahead and actual imposition of the less opportune terms of the new law.  In that stretch of six months, Fernandez-Vargas could have ended his illegal presence and potential exposure to the coming law by crossing back into Mexico.[11]  For

―――――――――

[11] In a series of letters submitted to the Court after oral argument, the parties dispute the consequences if Fernandez-Vargas had left voluntarily after IIRIRA's enactment and, specifically, the period of inadmissibility to which Fernandez-Vargas would thereupon have been subject.  Because we conclude that §241(a)(5) does not operate on a completed pre-enactment act, we need not consider the retroactive implications either of the fact of his inadmissibility or of any variance between the period of inadmissibility upon a postenactment voluntary return and that prescribed under the old regime.  The period of inadmissibility stems from an alien's illegal reentry within a specified time after a prior removal and is applicable to Fernandez-Vargas because he reentered shortly after his 1981 deportation, but Fernandez-Vargas does not challenge as impermissibly retroactive IIRIRA's lengthening of that period from 5 to 10 or 20 years, see 8 U. S. C. §1182(a)(6)(B) (1994 ed.); §1182(a)(9)(A)(ii) (2000 ed.).

In any event, any period of inadmissibility is subject to waiver by the Attorney General, see §1182(a)(6)(B) (1994 ed.); §1182(a)(9)(A)(iii) (2000 ed.), and presumably Fernandez-Vargas could plead his serious case for such a waiver (his marriage, his child) in seeking legal reentry

that matter, he could have married the mother of his son and applied for adjustment of status during that period, in which case he would at least have had a claim (about which we express no opinion) that proven reliance on the old law should be honored by applying the presumption against retroactivity.[12]

Fernandez-Vargas did not, however, take advantage of the statutory warning, but augmented his past 15 years of unlawful presence by remaining in the country into the future subject to the new law, whose applicability thus turned not on the completed act of reentry, but on a failure to take timely action that would have avoided application of the new law altogether. To be sure, a choice to avoid the new law before its effective date or to end the continuing violation thereafter would have come at a high personal price, for Fernandez-Vargas would have had to leave a business and a family he had established during his illegal residence. But the branch of retroactivity law that concerns us here is meant to avoid new burdens imposed on completed acts, not all difficult choices occasioned by new law. What Fernandez-Vargas complains of is the application of new law to continuously illegal action within his control both before and after the new law took effect. He claims a right to continue illegal conduct indefinitely under the terms on which it began, an entitlement of legal stasis for those whose lawbreaking is continuous. But "[i]f every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." L. Fuller, The Morality of Law 60 (1964) (quoted in *Landgraf,* 511 U. S., at 269, n. 24).[13]

-------

to the United States.

[12] See 394 F. 3d, at 890, and n. 11 (distinguishing Fernandez-Vargas's circumstance from that of aliens who had married, or both married and applied for adjustment of status, before IIRIRA's effective date).

[13] This is the nub of our disagreement with JUSTICE STEVENS. He says

Because we conclude that §241(a)(5) has no retroactive effect when applied to aliens like Fernandez-Vargas, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

––––––––––

it misses the point to say that Fernandez-Vargas could avoid the new law by returning to Mexico, which he thinks is like saying that a defendant could avoid a retroactive criminal penalty by locking himself up for 10 years, *post,* at 5, n. 2.  JUSTICE STEVENS thus argues that reimposing an order of removal to end illegal residence is like imposing a penalty for a completed act (the defendant's unspecified act in his analogy).  But even on his own analysis, Fernandez-Vargas continued to violate the law by remaining in this country day after day, and JUSTICE STEVENS does not deny that the United States was entitled to bring that continuing violation to an end.  He says, however, that Congress should not be understood to provide that if the violation continues into the future it may be ended on terms less favorable than those at the beginning.  But this is not the position that retroactivity doctrine imputes to an inexplicit Congress.  Fernandez-Vargas may have an equitable argument that the Government should not, for the future, eliminate an opportunity for continuing illegality accompanied by the hopes that long illegal residence and a prospect of marriage gave him in the past.  But Congress apparently did not accept such an argument, which could prevail here only if the presumption against retroactivity amounted to a presumption of legal stasis for the benefit of continuous lawbreakers.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–1376

_____

## HUMBERTO FERNANDEZ-VARGAS, PETITIONER *v.* ALBERTO R. GONZALES, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 22, 2006]

JUSTICE STEVENS, dissenting.

In 1982, petitioner Humberto Fernandez-Vargas, an alien who had previously been deported, reentered the United States illegally. Over the next 20 years, petitioner remained here. He worked as a truckdriver, owned a trucking business, fathered a child, and eventually married the child's mother, a United States citizen. The laws in place at the time of petitioner's entry and for the first 15 years of his residence in this country would have rewarded this behavior, allowing him to seek discretionary relief from deportation on the basis of his continued presence in and strong ties to the United States. See 8 U. S. C. §1254(a)(1) (1994 ed.).

In 1996, however, Congress passed a new version of the applicable provision eliminating almost entirely the possibility of relief from deportation for aliens who reenter the country illegally having previously been deported. See Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA), §305(a)(3), 110 Stat. 3009–599, 8 U. S. C. §1231(a)(5) (2000 ed.); see also *ante*, at 3, n. 4. The 1996 provision is silent as to whether it was intended to apply retroactively to conduct that predated its enactment.[1]

_____

[1] The statutory provisions expanding the class of people to whom criminal penalties for illegal reentry might apply, however, explicitly

Despite a historical practice supporting petitioner's read-
ing, and despite the harsh consequences that attend its
application to thousands of individuals who, like peti-
tioner, entered the country illegally before 1997, the Court
not only holds that the statute applies to preenactment
reentries but also that it has no retroactive effect. I dis-
agree with both of these conclusions.

I

In 1950, when Congress first gave the Attorney General
the authority to reinstate an order of deportation, it en-
acted a reinstatement provision containing no explicit
temporal reach.[2] See Internal Security Act, §23(d), 64
Stat. 1012, 8 U. S. C. §156(d) (1946 ed., Supp. V). The
natural reading of this provision, the one most consistent
with the "deeply rooted" traditional presumption against
retroactivity, *Landgraf* v. *USI Film Products*, 511 U. S.
244, 265 (1994), is that it would apply to deportations that
occurred before the provision's enactment but not to
preenactment reentries. While both deportation and
reentry can constitute "events completed before [the provi-
sion's] enactment," *id.*, at 270, an alien's reentry is the act
that triggers the provision's operation and is therefore the
act to which the provision attaches legal consequences.

When the Immigration and Naturalization Service (INS)
promulgated regulations implementing the 1950 statute,
however, it did not read the statute so naturally. Instead,
the INS' regulations, embodying an overly strong version

_____

apply only to postenactment reentries. See IIRIRA, §324(c), 110 Stat.
3009–629, note following 8 U. S. C. §1326.

[2] The provision stated:
"Should any alien subject to the provisions of subsection (c) unlawfully
return to the United States after having been released for departure or
deported pursuant to this section, the previous war-rant of deportation
against him shall be considered as reinstated from its original date of
issuance." 64 Stat. 1012, codified as 8 U. S. C. §156(d) (1946 ed., Supp.
V).

of the presumption against retroactivity, provided that an order of deportation could only be reinstated if that deportation occurred after the statute's enactment date. See 8 CFR §152.5 (1950 Cum. Supp.). Thus, the INS read the reinstatement provision as inapplicable even to reentries that occurred *after* the statute's enactment date if the underlying deportation had been entered before that date; it follows *a fortiori* that the provision was considered inapplicable to reentries that occurred before the statute's enactment.

Congress corrected the INS' error two years later by adding the clause "whether before or after the date of enactment of this Act." Immigration and Nationality Act, §242(f), 66 Stat. 212, 8 U. S. C. §1252(f) (1994 ed.); see also *ante*, at 2, and nn. 2–3. As the Court correctly notes, that amendment "most naturally referred not to the illegal reentry but to the alien's previous deportation or departure." *Ante*, at 8. The best interpretation of Congress' intent with regard to the 1952 statute, then, was that it meant to apply the reinstatement provision to preenactment deportations but to preserve the status quo with regard to preenactment reentries: In accordance with the traditional presumption against retroactivity, preenactment reentries would remain uncovered by the reinstatement provision.

In 1996, when Congress enacted the current reinstatement provision, it drafted a version of the statute that, like its 1950 predecessor, was silent as to its temporal reach. See 8 U. S. C. §1231(a)(5) (2000 ed.). If we assume (as the Court does) that the addition of the "before-or-after" clause in the 1952 statute merely clarified Congress' original intent in 1950 to make the provision applicable to preenactment departures without authorizing any application to preenactment reentries, it is reasonable to attribute precisely the same intent to the Congress that enacted the 1996 statute: As in the 1950 and 1952 ver-

sions of the provision, Congress intended the 1996 rein-
statement provision to apply to preenactment deportations
but not to preenactment reentries.

In sum, our normal rules of construction support the
reasonable presumption that Congress intended the provi-
sion to cover only postenactment reentries.  Accordingly,
the 1996 reinstatement provision should not be construed
to apply to petitioner's earlier entry into the United
States.

## II

The Court not only fails to give the 1996 Act its most
normal interpretation, but also erroneously concludes that
the provision does not have any retroactive effect.  The
Court reaches this conclusion based on its judgment that
the provision applies not to conduct that occurred before
the statute's enactment date, but rather to "an indefinitely
continuing violation that the alien himself could end at
any time by voluntarily leaving the country." *Ante*, at 13.
This reasoning is unpersuasive.

It is true, of course, that the order of deportation en-
tered against petitioner in 1981 could not be reinstated
unless he was present in the United States, and that, until
he was arrested in 2003, petitioner could have chosen to
leave the United States.  But it is precisely petitioner's
"continuing violation" that allowed him to be eligible for
relief from deportation in the first place: He was required
to have been physically present in the United States for a
period of not less than seven years, to have been a person
of good moral character during that time, and to have
developed ties to the United States such that his deporta-
tion would result in extreme hardship to himself or to his
United States citizen wife or child.[3]    See 8 U. S. C.

————————

[3] Although petitioner became eligible for relief from deportation after
being physically present in the United States for seven years, he could
not apply for that relief until the Government placed him in deporta-

§1254(a)(1) (1994 ed.); see also *INS* v. *Phinpathya*, 464 U. S. 183 (1984) (strictly construing physical presence requirement). Moreover, under the pre-1996 version of the reinstatement provision, the longer petitioner remained in the United States the more likely he was to be granted relief from deportation. See *Matter of Ige*, 20 I. & N. Dec. 880, 882 (1994) (listing factors considered in evaluating extreme hardship requirement, including alien's length of residence in United States, family in United States, business or occupation, and position in community).

Given these incentives, petitioner legitimately complains that the Government has changed the rules midgame. At the time of his entry, and for the next 15 years, it inured to petitioner's benefit for him to remain in the United States continuously, to build a business, and to start a family. After April 1, 1997, the date on which the applicable reinstatement provision became effective, all of these activities were rendered irrelevant in the eyes of the law. Only the Court's unfortunately formalistic search for a single "past act that [petitioner] is helpless to undo," *ante*, at 13, allows it to conclude that the provision at issue has no retroactive effect.[4] For regardless of whether his

———————

tion proceedings, at which point he could raise his eligibility as an affirmative defense. Cf. *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 951–952 (1997) (applying presumption against retroactivity to statute eliminating affirmative defense).

[4] Even on its own terms the Court's logic is troubling. The Court believes that petitioner could have avoided being affected by the 1996 reinstatement provision, not just retroactively but in any way whatsoever, by leaving the country prior to its effective date—a date that occurred six months after the statute's enactment date not to give aliens "ample warning," *ante*, at 11, 13, but instead to allow the Attorney General to prepare for the substantial changes caused by the IIRIRA and to promulgate regulations to effectuate that Act. See §309, 110 Stat. 3009–625. But had petitioner "take[n] advantage of the statutory warning," *ante*, at 15, he would have imposed upon himself

1982 reentry was or was not an act that he could now
"undo," it is certainly an act to which the 1996 reinstate-
ment provision has attached serious adverse conse-
quences. Because the provision has an undeniably harsh
retroactive effect, "absent a clear indication from Congress
that it intended such a result," *INS* v. *St. Cyr*, 533 U. S.
289, 316 (2001), we should apply the presumption against
retroactivity and hold that the 1996 reinstatement provi-
sion does not apply to petitioner.

   Accordingly, I respectfully dissent.

―――――――――

the very same punishment—the guarantee of removal to Mexico—that
he hopes to avoid. Just as we would not say that a defendant may
avoid the retroactive application of a criminal statute by locking him-
self up for 10 years, it cannot be that petitioner's ability to leave the
country of his own accord somehow helps to prove that the provision at
issue has no retroactive effect.